**Margaret B. FORD and Margaret L. Ford, Individuals and Shareholders of Riverview Golf Course, Inc., and on Behalf of Riverview Golf Course, Inc., and Other Shareholders of the Corporation, Appellees**

v.

**William K. FORD, Individually and as President of Riverview Golf Course, Inc., and Riverview Golf Course, a Corporation, Appellants.**

Superior Court of Pennsylvania.

Argued March 2, 2005.

Filed June 29, 2005.

---

Brendan K. Patrick, White Oak, for appellant.

Jason Mettley, Pittsburgh, for appellee.

Before: FORD ELLIOTT, MUSMANNO, and LALLY–GREEN, JJ.

LALLY–GREEN, J.

¶ 1 Appellants, William K. Ford ("Bill"), individually and as president of Riverview Golf Course, Inc., and Riverview Golf Course, a closely held corporation ("Riverview" or "the corporation"), appeal from the order entered on June 7, 2004. The trial court found that Bill acted oppressively toward minority shareholders by engaging in self-dealing and by excluding the minority from any benefits of Riverview. We affirm.

¶ 2 The trial court set forth the facts of the case as follows:

Riverview Golf Course, Inc. ("Riverview" or "the corporation"), a Pennsylvania corporation incorporated in 1961, owns and operates the Riverview Golf Course. The golf course was built on a reclaimed strip mine along the Monongahela River in Elizabeth, Pennsylvania. The 18–hole course consists of approximately 150 acres and includes a clubhouse, driving range, practice green, and pole barn for the golf carts. The water for the golf course is pumped directly from the Monongahela River at no cost to the corporation.

Initially the corporation had four shareholders, including William B. Ford ("William"), husband of Plaintiff Margaret B. Ford ("Margaret"), and father of Plaintiff Margaret L. Ford ("Peggy") and Defendant William K. Ford ("Bill"). At some point, three of the initial shareholders bought out the fourth, leaving William as the majority shareholder and President of the corporation.

In 1969, Bill began operating a golf cart business and a pro shop at the course as sole proprietorships. Both businesses were staffed by Riverview employees, who were paid by Riverview. Bill did not reimburse the corporation for either the employees' time or the rental value of the space occupied by his businesses. During William's tenure as President of the corporation, both Bill and Peggy worked at the golf course: Bill as a salaried employee, and Peggy periodically as an hourly employee.

In 1988, the other two shareholders sued William, seeking to dissolve the corporation. The case settled, with William lending $300,000 to the corporation so the corporation could buy out the other two shareholders. The corporation made regular payments to William on the notes, although it initially paid only interest. Bill contributed $150,000 to the buyout, and William gave Bill enough stock to make him the majority shareholder of Riverview, although William remained the President.

In 1992, the corporation subdivided a 3½ acre parcel of its property and sold it to Bill for $500 per acre. Bill built a house on this parcel. The grounds around the house were maintained by corporation employees. The house draws from the corporation's water supply.

When William died in 1995, Bill took over as President of Riverview.. Shortly thereafter, Bill fired Peggy. Bill hired his wife and son as salaried employees of the corporation, and both were elected to the corporation's board of directors. Upon William's death, Margaret inherited William's stock, making her a minority shareholder of the corporation. Peggy was also a minority shareholder, her father having given her stock in the corporation at various times before his death.

Margaret and Peggy filed a suit in law and equity against Riverview in 1997, claiming Bill was using the corporation for his own benefit and not for the benefit of the minority shareholders or the corporation. The parties settled the case, executing a release dated July 19, 1998. Pursuant to the settlement, the corporation borrowed $200,000 to pay Margaret the balance of the notes to her as William's beneficiary.

Bill continued to own and operate the pro shop and cart business separately, but began paying Riverview $13,655 each year for the use of its assets, including: (1) $5.50 per hour for 500 hours per year for the use of corporation employees; (2) $7.00 per square foot per year for 1000 square feet of pro shop space; (3) $3.00 per square foot per year for 1,200 square feet of cart barn space; (4) $30.00 per month for grass cutting; and (5) $20.00 per month for water.

In 2002, Bill lent approximately $400,000 to the corporation: $200,000 for improvements to the clubhouse and course, and $200,000 for repayment of the bank note taken to pay Margaret for the 1998 settlement. These debts to Bill are the only debts of the corporation.

Believing that they continued to be treated unfairly, Margaret and Peggy in 1999 again filed a complaint against Bill and Riverview in equity and at law. They claimed that Bill continued to manage the corporation for his own benefit while oppressing the minority shareholders, and asked this court to appoint a custodian. Prior to trial, Margaret gave her shares in Riverview to Peggy and Evan Ford, the brother of Bill and Peggy. At the time of trial, the 100 shares were held as follows: Bill held 37 shares; Peggy, 17 shares; Evan, 9 shares; Jason Ford, Bill's son, 4 shares; and 33 shares were held by the corporation as treasury stock.

A nonjury trial was held before this court on April 15 and 16, 2003. Upon consideration of the evidence offered at trial, this court made findings of fact and conclusions of law, stating in essence that Bill had financially benefited himself, his wife, and his son to the detriment of the minority shareholders of the corporation. This court found Bill's conduct "oppressive" under 15 Pa.C.S.A. § 1767(a)(2), warranting the appointment of a custodian. No decree nisi was entered at that time in order to allow the parties to attempt to resolve their differences by conciliation. When no settlement was reached, the decree nisi was entered, a custodian was appointed, and the Defendants filed post-trial motions. This court denied Defendants' post-trial motions and entered the decree nisi as a final decree. Defendants appealed.

Trial Court Opinion, 8/23/04, at 1–4 (footnote omitted).[1]

¶ 3 Appellants raise six issues on appeal:

---

1. On June 30, 2004, the trial court ordered Appellants to file a Concise Statement of Matters Complained of on Appeal under Pa.R.A.P.

1925. Appellants complied on July 13, 2004. Appellants raised all of the issues that they

1. Whether the court erred as a matter of law and committed abuse of discretion by finding oppressive conduct pursuant to 15 Pa.C.S.A. § 1767(a)(2)?

2. Whether the court committed error of law and abuse of discretion in the appointment of a custodian?

3. Whether the court committed abuse of discretion in making a corporation pay for the custodian?

4. Whether the court erred as a matter of law and committed abuse of discretion to appoint a custodian to investigate matters outside the law of the case?

5. Whether it is a violation of due process rights to appoint a custodian under the circumstances?

6. Whether the court erred as a matter of law and committed an abuse of discretion in appointing a custodian when all the equities presented at trial opposed said appointment?

Appellants' Brief at 3.[2]

¶ 4 First, Appellants argue the trial court erred or abused its discretion in finding that Bill acted oppressively toward the minority owners of the corporation, so as to justify the appointment of a custodian.

¶ 5 This Court recently set forth the proper standard of review as follows. A claim of oppressive conduct, like a claim of breach of fiduciary duty, "sounds in equity, and, as such, our standard of review is limited. We will reverse only where the trial court was palpably erroneous, misapplied the law or committed a manifest abuse of discretion. Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it." *Viener v. Jacobs*, 834 A.2d 546, 554 (Pa.Super.2003) (citations omitted), *appeal denied*, 579 Pa. 704, 857 A.2d 680 (2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1300, 161 L.Ed.2d 107 (2005). "[W]e will not find that the trial court abused its discretion where there is a mere 'difference of opinion' regarding an interpretation of the facts. Rather, an abuse of discretion is found only in flagrant cases where there is not a substantial ground for difference of opinion." *Id.* at 556 (citation omitted). "When reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence. Absent an abuse of discretion, we are bound by the lower court's assessment of credibility of the parties." *Id.* at 554.

¶ 6 The Business Corporation Law authorizes the court to appoint a custodian of a corporation when it appears that:

> (2) in the case of a closely held corporation, the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5% or more of the outstanding shares of any class of the corporation in their capacities as shareholders, directors, officers or employees[.]

15 Pa.C.S.A. § 1767(a)(2).

¶ 7 The Business Corporation Law does not define the phrase "illegally, oppressively or fraudulently." The 1990 Amend-

---

now raise on appeal. The trial court filed a Rule 1925(a) opinion on August 20, 2004.

**2.** Counsel is reminded that Pa.R.A.P. 2118 states: "The summary of argument shall be a **concise** summary of the argument.... The summary of argument **should not exceed one page** and should **never exceed two pages**." (Emphasis added.) Appellants' summary of argument extends over three pages. Substantial non-compliance may result in quashal or dismissal of the appeal. Pa.R.A.P. 2101. We will not quash the appeal, but we do disapprove of counsel's failure to heed the rules of procedure. *See, Kenis v. Perini Corp.*, 452 Pa.Super. 634, 682 A.2d 845, 847 n. 3 (1996).

ed Committee Comment to § 1767 indicates that these decisions are to be made on a case-by-case basis. In *Leech v. Leech*, 762 A.2d 718 (Pa.Super.2000), this Court noted that "oppression is defined as 'unjust or cruel exercise of authority or power.'" *Id.* at 720, *citing, Merriam Webster's Collegiate Dictionary* (10th ed. 1996). The *Leech* Court left open the possibility that other actions may nevertheless be deemed "oppressive."

¶ 8 In *Gee v. Blue Stone Heights Hunting Club, Inc.*, 145 Pa.Cmwlth. 658, 604 A.2d 1141, 1145 (1992), our sister Court, the Commonwealth Court, adopted a broader definition of oppressive conduct. Specifically, the *Gee* court adopted "New York's definition of oppressive actions which states that: 'Oppressive actions refer to conduct that substantially defeats the "reasonable expectations" held by minority shareholders in committing their capital to the particular enterprise.'" *Id., quoting, In the Matter of the Judicial Dissolution of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173 (1984). While we are not bound by the Commonwealth Court's decisions, we may look to that Court for guidance. *Yoder v. Am. Travellers Life Ins. Co.*, 814 A.2d 229, 232 n. 4 (Pa.Super.2002), *appeal denied*, 573 Pa. 673, 821 A.2d 588 (2003).

¶ 9 The definition of oppressive conduct set forth in *Gee* is consistent with analogous Superior Court precedent. *See, Viener*, 834 A.2d at 556 ("It is axiomatic that majority shareholders have a duty not to use their power in such a way to exclude minority shareholders from their proper share of benefits accruing from the enter-

prise. The aforementioned principle does not mean that majority shareholders may never act in their own interest, but when they do act in their own interest, it must also be in the best interest of all shareholders and the corporation."). Thus, we adopt the definition set forth in *Gee* as the proper statement of the law.[3]

¶ 10 We now turn to the trial court's findings of fact and conclusions of law. The trial court found that Riverview is a profitable corporation. Adjudication and Order of Court, 6/11/2003, at 5. Bill, the president and majority shareholder of Riverview, draws a modest salary from the corporation ($46,000.00 per year).

¶ 11 Bill's primary source of income comes from his independent ownership of the pro shop and golf cart businesses on the Riverview premises. *Id.* Bill essentially has the freedom to operate those businesses as he sees fit. *Id.* Those businesses took in over $200,000.00 per year for the last two years. *Id.* Bill derives substantial benefits from having these businesses on the premises. *Id.* at 6. Employees that are paid by the corporation do a substantial amount of work for Bill's separately-owned businesses.[4] *Id.* at 6.

¶ 12 After the settlement of the prior lawsuit in 1998, Bill began paying the corporation a small fee to rent the space for these businesses. Specifically, Bill "began paying Riverview $13,655 each year for the use of its assets, including: (1) $5.50 per hour for 500 hours per year for the use of corporation employees; (2) $7.00 per square foot per year for 1000 square feet

---

**3.** We also note that Appellants accept the *Gee* rule as an accurate statement of the law. Appellant's Brief at 10.

**4.** The trial court implied that Bill benefits because his separately-owned businesses do not have to pay these employees a salary or

wages. Rather, the corporation pays these employees. Bill does pays the corporation $5.50 per hour for 500 hours of corporation-employee time, but these employees work more than a total of 500 hours per year for Bill's businesses. *Id.* at 5–6.

of pro shop space; (3) $3.00 per square foot per year for 1,200 square feet of cart barn space; (4) $30.00 per month for grass cutting; and (5) $20.00 per month for water." Trial Court Opinion, 8/23/2004, at 3.

¶ 13 The minority shareholders at issue are Margaret (Bill's mother) and Peggy (Bill's sister). Margaret held her minority shares until shortly before trial, when she gave them to her son Evan and to Peggy. Adjudication and Order of Court, 6/11/2003, at 4. According to the trial court, "Margaret did not receive any benefit from her ownership interest during Bill's tenure as president." *Id.* at 6, ¶ 9.

¶ 14 Peggy held 17 shares as of the time of trial. *Id.* at 4. Peggy was an occasional hourly employee at the golf course, until Bill fired her in 1995. *Id.* at 3. According to the trial court, "Peggy has not derived any benefit from her ownership interest in the corporation during Bill's tenure as president." *Id.* at 6, ¶ 10.

¶ 15 The trial court found that Bill engaged in oppressive conduct because he used his majority status to benefit himself, while excluding Margaret and Peggy from any benefit. *Id.* at 7–8.

¶ 16 With this background in mind, we now turn to the specifics of Appellants' argument. Appellants argue that the trial court erred or abused its discretion in finding that Bill acted oppressively toward the minority owners of the corporation. Appellants present many sub-arguments in support of this general proposition. We will address each sub-argument in turn.

¶ 17 First, Appellants claim that the trial court, the Honorable Eugene Strassburger, violated the doctrine of collateral estoppel and/or the coordinate jurisdiction rule by basing its finding of oppressiveness on acts that had already been the subject of a settlement on July 14, 1998. According to Appellants, this prior case involved Bill's ownership and operation of the pro shop and golf cart business. Appellants imply that because the parties settled that case, the trial court could not use the same conduct as a basis for oppressiveness in the instant case. In support of their position, Appellants cite an order in the instant case from Judge (now Justice) Max Baer, dated July 10, 2000, which reads as follows:

> AND NOW, to-wit, this 10th day of July, 2000, after presentation and argument on the following Preliminary Objections, it is hereby ORDERED, ADJUDGED and DECREED that: Plaintiffs' Complaint shall be construed to seek relief only for damages arising after July 14, 1998, as plaintiffs released liability for consideration for all events occurring amongst the parties over the subject matter prior to said date.

Trial Court Order, 7/10/2000 (Baer, J.).

¶ 18 We will begin with Appellants' argument regarding collateral estoppel. Our Supreme Court has explained that "a plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Tucker v. Phila. Daily News,* 577 Pa. 598, 848 A.2d 113, 129 (2004).

¶ 19 In the instant case, the record reflects that the issue decided in the prior adjudication was **not** identical with the one presented in the later action. The prior case concerned events occurring on or **before** July 14, 1998. The instant case concerned events which took place **after** July

14, 1998. As the trial court succinctly explained:

> The evidence at trial showed that even after the 1998 settlement, Bill continued to engage in some of the same conduct that was the subject of the earlier lawsuit. Certainly, the Plaintiffs may not recover damages for conduct that was the subject of the 1998 settlement between the parties. But to the extent that Bill Ford continued to engage in conduct that continued to deprive the plaintiffs of the benefits of the corporation, Defendants were liable for that conduct and this court properly considered that evidence.

Trial Court Opinion, 8/20/2004, at 8–9.

¶ 20 We agree with the esteemed trial court in this regard. We also note that the critical issue in the instant case was not, strictly speaking, whether Bill benefited himself in the way he ran the pro shop and golf cart business. Rather, the key question was whether Bill engaged in oppressive conduct by depriving minority shareholders Margaret and Peggy of any benefits. If this deprivation continued after on July 14, 1998, Margaret and Peggy were entitled to seek relief for that continued deprivation.[5] Thus, we see no error of law or abuse of discretion. Appellants' first claim fails.

¶ 21 Next, as noted above, Appellants argue that the trial court violated the coordinate jurisdiction rule by ignoring Judge Baer's order dated July 10, 2000 (set forth above). This Court recently explained the coordinate jurisdiction rule as follows:

> The coordinate jurisdiction rule provides that courts of the same jurisdiction cannot overrule each other's decisions in the same case. This rule promotes judicial economy and efficiency, and serves to protect the expectations of the parties, to insure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation.

*Jones v. Rivera*, 866 A.2d 1148, 1151 (Pa.Super.2005).

¶ 22 The record reflects that Judge Strassburger did not "overrule" Judge Baer's July 10, 2000 order. Rather, Judge Strassburger followed Judge Baer's order by not considering actions taking place before July 14, 1998. *See*, Trial Court Opinion, 8/20/2004, at 8 ("Certainly, the Plaintiffs may not recover for conduct that was the subject of the earlier lawsuit."). Judge Strassburger did properly consider actions that took place after July 14, 1998, even if they were substantially similar to Appellants' prior actions. As noted above, the new oppressive actions could form the basis of a new lawsuit. This claim fails.

¶ 23 Next, Appellants argue that the trial court erred by ignoring a prior order for partial summary judgment. According to Appellants, the summary judgment order dismissed all claims except for those raised in the Affidavit of Frank Halechko. Appellants further argue that the actual trial testimony concerned issues far beyond those set forth in Mr. Halechko's affidavit.

¶ 24 Our standard of review for this issue is well-settled:

> This court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or an error of law... Further if the

---

5. We also note that Appellants cite no evidence that the 1998 settlement intended to forever release them from any and all liability, even if they continued to engage in the same type of conduct. As Appellants themselves acknowledge, "[t]he language contained in the Release itself, is unhelpful in determining what 'conduct' was to be corrected in the prior suit, and what was released." Appellants' Brief at 21.

basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Pulliam v. Fannie*, 850 A.2d 636, 639 (Pa.Super.2004) (citations omitted).

¶ 25 The record reflects that on April 7, 2003, the trial court entered summary judgment "except as to issues covered in the Affidavit of Frank Halechko." Trial Court Order, 4/7/2003 (no docket number). Mr. Halechko's affidavit reads as follows:

My name is Frank Halechko. I live in Monongahela, PA. I am 68 years old. From 1985 to May of 2002 I was employed at the Riverview Golf Course by the Riverview Corp. I worked at virtually all the jobs from inside the main building to the Cart Pavilion. In any one day I could work the golf carts at the cart pavilion and as a Starter right next to the Cart Pavilion as well as inside the main building collecting money for green fees and carts as well as selling in the Pro Shop. I was paid by check from the corporation. This continued until the day I left my employment. For scheduling I would have been scheduled either inside or out although I usually worked inside with a good majority of my work at the Pro Shop. Although I kept the number of hours that I worked I never broke down the hours I worked at each job. Up until the time I left nobody broke down where they worked and for how long, it would it would be impossible. I also worked steady Sunday mornings for 10 or 12 years, from 6:00 a.m. until 1:00 p.m. I collected all fees for carts, greens fees and Pro Shop. (Later a driving range was added). I basically worked

the three busiest days of the week. I also used to work Saturday mornings. On the first day of trial, Appellants argued that the trial should be limited to the issues in Mr. Halechko's affidavit. N.T., 4/15–16/2003, at 13. Judge Strassburger responded by saying that the intent of his summary judgment order was "to limit the matters regarding these outside witnesses with regard to the self-dealing and oppressive conduct, but I did not intend to exclude testimony from any of the parties on this stuff. There were various affidavits presented which were gross hearsay, and it was my intention to exclude those." *Id.* at 14.

¶ 26 The record reflects that the issues at trial did go far beyond those presented in the Halechko affidavit. Assuming *arguendo* that the trial court did err in this respect, Appellants are not entitled to relief because they have failed to establish that they were prejudiced by the ruling. Appellants do not develop any argument that they were unfairly surprised or unable to present a meaningful defense as a result of the trial court's ruling. Indeed, the trial record reflects that Appellants did prepare a meaningful defense. Because Appellants have failed to demonstrate prejudice, they are not entitled to relief on this claim.

¶ 27 Next, Appellants argue that the court erred by finding that Bill engaged in oppressive behavior. Appellants concede that behavior is oppressive if it defeats the reasonable expectations of the minority shareholders. Appellants' Brief at 22, *citing, Gee*, 604 A.2d at 1145. Appellants further note that the only evidence of minority expectations in this case came from Peggy, who stated that she expected lifetime employment. Finally, Appellants contend that this expectation was unreasonable.

¶ 28 We agree with Appellants that an expectation of lifetime employment

was unreasonable, absent an express agreement to that effect. *See, ARC Mfg. Co. v. Konrad,* 321 Pa.Super. 72, 467 A.2d 1133, 1136 (1983). The trial court held that when Appellants granted no benefits whatsoever to the minority shareholders, Appellants presumptively defeated the minority's reasonable expectations:

> Minority shareholders have a reasonable expectation to derive some benefit from their ownership interest in a corporation, particularly when a corporation is profitable. *See Gunzberg v. Art–Lloyd Metal Prod. Group,* (N.Y.App.Div. 1985)[.] When minority shareholders receive no benefit from their interest in a corporation, while the majority shareholder benefits substantially, the conduct of the majority shareholder may be found to be inherently oppressive.
>
> The evidence at trial was that Plaintiffs receive no benefit from their interest in the corporation, and Defendants argue in essence that it is reasonable for minority shareholders to have no expectation of any benefits, as that is simply the lot of a minority shareholder. That might be true in a case where a corporation is not profitable, or where no shareholder is receiving benefits. But in this case, the evidence showed that Riverview is a viable corporation, taking in over $1,000,000 each year in gross receipts. At the time of trial, the corporation maintained a money market fund with balances of several hundreds of thousands of dollars, and at one time had enough excess cash to purchase a CD to earn extra interest. In such a case, the failure of a majority shareholder to confer any benefit on the minority shareholders defeats the reasonable expectations of the shareholders and constitutes oppressive behavior.

Trial Court Opinion, 8/20/2004, at 6.

¶ 29 We agree with this reasoning, and hereby adopt it. Peggy's expectation of lifetime employment may have been unreasonable. On the other hand, under the facts presented here, Peggy and Margaret do have a reasonable expectation to receive **some** benefit from their minority shares in this profitable corporation. The proper measure of this benefit, and the proper measure of what constitutes a reasonable expectation, will vary from case to case. Like the trial court, we conclude that these are matters best reserved to the custodian in the first instance.

¶ 30 Next, Appellants suggest that the only minority shareholders who may make a claim for oppressive conduct are those who have either contributed capital to the enterprise, or are officers in the corporation. Appellants' Brief at 24–25. Appellants point out that Peggy was a part-time hourly employee who received her shares through gifts, and who never contributed capital to the enterprise.

¶ 31 We disagree. The Business Corporation Law (BCL) allows for the appointment of a custodian where "the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5% or more of the outstanding shares of any class of the corporation **in their capacities as shareholders, directors, officers or employees** ...." 15 Pa.C.S.A. § 1767(a)(2) (emphasis added). Thus, Section 1767 on its face applies to Peggy and Margaret because they are (or were) minority shareholders. Even if Peggy and Margaret did not contribute capital to the enterprise, they are still "shareholders" and thus entitled to the protections of § 1767(a)(2).

¶ 32 The BCL contains several exceptions to the appointment of a custodian under § 1767, but the exceptions urged by

Appellants are not among them. *See*, 15 Pa.C.S.A. § 1767(b)(2). Our function as an appellate court is to interpret the statute as written, not to create exceptions where none exist. *Crosby v. Sultz*, 405 Pa.Super. 527, 592 A.2d 1337, 1345 (1991). Section 1767 imposes no limits of the type urged by Appellants, and we cannot create them by fiat.[6] While a minority shareholder's lack of status as an investor or officer may be relevant to the "reasonable expectations" of such a shareholder, this fact does not preclude relief entirely. Appellants' claim fails.

¶ 33 Next, Appellants argue that the trial court's factual findings with respect to oppressiveness are unsupported by the record. Appellants' Brief at 28–31. Specifically, Appellants argue that the court erred when it found that Bill pays submarket rental rates to the corporation for use of the pro shop and golf cart businesses. Appellants also claim that the court erred when it found that Bill used more than 500 hours of corporation employee time.

¶ 34 Again, "when reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence. Absent an abuse of discretion, we are bound by the lower court's assessment of credibility of the parties." *Viener*, 834 A.2d at 554. The finder of fact is free to believe all, part, or none of the evidence. *Makozy v. Makozy*, 2005 PA Super 110,

¶ 14, 874 A.2d 1160. "Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the trial court, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion." *Id.* (citations and brackets omitted).

¶ 35 Of course, majority shareholders may act in their own best interest; on the other hand, they may not "use their power in such a way to exclude minority shareholders from their proper share of benefits accruing from the enterprise." *Kessler v. Broder*, 851 A.2d 944, 948 (Pa.Super.2004), *appeal denied*, 868 A.2d 1201 (Pa.2005). Indeed, majority shareholders have a fiduciary duty to the minority shareholders. *Id.* Freezing out the minority in order to benefit the majority is a breach of fiduciary duty. *Id.*

¶ 36 We have reviewed the evidentiary record, and conclude that the court could have reached the factual conclusions it did on the evidence presented. The record reflects that Bill engaged in self-dealing by paying a nominal sum to the corporation, in exchange for the right to personally reap all of the profits from the lucrative pro shop and golf cart businesses. As noted above, the trial court found that Bill's businesses took in over $200,000.00 per year, but Bill paid only about

---

6. Appellants note that an Amended Committee Comment to § 1767 provides: "[Section 1767(a)(2)] is intended to establish a statutory foundation for the development on a case-by-case basis of safeguards for **incorporated partners** in dealing with each other, rather than forcing the courts to distort the general rules of corporate law in order to grant relief in closely held situations." § 1767 Amended Committee Comment—1990 (emphasis added). Appellants argue that this provision shows an intent to limit relief to investing partners and/or officers. We disagree. While the shareholders of closely held corporations are often investors and/or officers, the statute and the comment do not limit relief to only these individuals. Indeed, the Comment goes on to point out that § 1767(a)(2) differs from the Model Business Corporation Act § 16(a)(1)(1982) insofar as § 1767 **does** provide relief to "non officer employee shareholders." § 1767 Amended Committee Comment—1990.

$13,500.00 per year in rental and labor fees to Riverview. The court found that in doing so, Bill effectively siphoned off income that should have inured to the corporation as a whole. The court found that at the same time, Bill (in his capacity as majority shareholder and president of Riverview) took no steps to provide any benefits to the minority shareholders. It is this combination of factors that led the trial court to find that Bill acted oppressively. The evidentiary record supports the trial court's position. N.T., 4/15–16, 2003, at 39–130 (testimony of Bill Ford). This claim fails.

¶ 37 We will address all of Appellants' remaining arguments together. In Part II of their brief, Appellants claim that the court erred by appointing a custodian. Appellants suggest that the court is improperly using a custodian to find facts that could have (and should have) been presented at trial. In Part III, Appellants argue that the court erred in making them pay a $10,000.00 retainer for the custodian's services. In Part IV, Appellants argue that the court erred by appointing a custodian to examine issues outside of those presented in the affidavit of Frank Halechko. In Part V, Appellants argue that the court violated Appellants' due process rights by appointing a custodian, because Appellants will not be able to challenge the custodian's factual findings. In this section, Appellants again suggest that the court is improperly using a custodian to find facts that could have (and should have) been presented at trial. Finally, in Part VI, Appellants claim that "the court erred as a matter of law and committed an abuse of discretion in finding for the plaintiffs for the appointment of a custodian when all of the equities presented at trial favored defendants." Appellants' Brief at 36.

¶ 38 Issues that are not properly developed by citation to pertinent legal authority are waived. *Andaloro v. Armstrong World Indus.*, 799 A.2d 71, 87 (Pa.Super.2002), *appeal denied*, 573 Pa. 682, 823 A.2d 143 (2003). All of these issues are either undeveloped by pertinent legal authority, and/or largely repeat issues that we have already decided. Thus, we decline to address them further.

¶ 39 Order affirmed.