# IN THE COURT OF APPEALS OF IOWA

No. 14-0564
Filed May 6, 2015

**CAROLYN AHRENS, Substituted for**
**RICHARD AHRENS,**
        Plaintiff-Appellant,

**vs.**

**AHRENS AGRICULTURAL INDUSTRIES**
**CO., a/k/a MIRACO and B. CARTER**
**THOMSON,**
        Defendants-Appellees,

**And**

MIKE WITT and SUSAN WITT,
        Defendants.
_____

        Appeal from the Iowa District Court for Poweshiek County, Annette J.

Scieszinski, Judge.


        Richard Ahrens appeals the district court's dismissal of his claims for

financial compensation and other equitable relief, including breach of fiduciary

duty, oppression, and unjust enrichment.  **AFFIRMED.**


        Stephen R. Eckley and David W. Nelmark of Belin McCormick, P.C., Des

Moines, for appellant.

        Gregory A. Witke and Jason W. Miller of Patterson Law Firm, L.L.P., Des

Moines, for appellees.

        Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**BOWER, J.**

Richard Ahrens appeals[1] the district court's dismissal of his claims for financial compensation and other equitable relief, including breach of fiduciary duty, oppression, and unjust enrichment. We find Richard's claims are not supported by the evidence and affirm the district court's dismissal.

## I.    BACKGROUND FACTS AND PROCEEDINGS

Ahrens Agricultural Industries Co. (AAI) is a business located in Grinnell, Iowa, that produces fifty types of livestock-watering products under the trade name Miraco. Originally Miraco was a division of Miracle Recreation Equipment, a playground equipment company owned by Claude Ahrens (Claude)[2]. In 1983, Claude made Miraco a separate "subchapter S" corporation. For approximately the past twenty years, B. Carter Thompson (Carter) and Mike Witt (Mike) have overseen the day-to-day operations and overall company management. Miraco consists of 10,000 authorized shares of common stock; only 2000 shares were initially issued, with 200 of the issued shares retained as treasury stock to award to key employees. Miraco currently has sixteen shareholders, and has not issued additional shares of stock.

The Miraco board of directors consists of Carter, Mike, and Susan Witt (Susan) (Claude's granddaughter and Mike's wife). Carter began working for Miracle after his discharge from the army in 1971. In 1979 Miraco separated

---

[1] Richard Ahrens died while this action was pending. Carolyn Ahren's motion to substitute party was granted by this court on April 24, 2015. For ease of reference we will continue to refer to the defendant as Richard Ahrens.

[2] Miracle was sold in 1993, and Claude used the proceeds from the sale to fund the Ahrens Foundation. The foundation focused on developing parks and recreation projects in Grinnell.

from Miracle and Claude asked Carter to help develop the first Miraco products. Carter subsequently served as vice president of Miraco until approximately 1994 when Claude promoted him to president; he was made a director in 2007 or 2008. Currently, Carter is still the president and he holds 11.5% of the company stock. Shortly after his marriage to Susan, Mike began working for Miraco as a salesman in the early 1990s. He now acts as the vice president and chairs the company's board. Mike holds 26.25% of the company stock. Susan has worked in the office operations since the early 1990s. She holds 26.25% of the company stock and serves as the board's secretary.

Richard Ahrens (Richard) became involved with Miraco when Claude (his uncle) brought him into the company to groom him for a future leadership role. In 1993, Claude made Richard a shareholder by selling him 450 shares of stock (25% of the company stock at that time).[3] Richard served as vice-chairman and was on the board of directors. Richard was responsible for the overall investment of Miraco and for overseeing new product design. Richard worked in the office with Claude's mentoring and Carter's supervision, but the majority of Richard's time was spent working on a park project for Claude's charitable foundation. During this time, Richard and his wife moved into Claude's home and resided with him.

In December 1995, Claude terminated Richard's employment with Miraco. Concerning the termination, Carter recalled Claude was unhappy with the way things were going and did not want Richard to be actively involved with the

---

[3] Claude sold the stock to Richard for $750,000 ($1666.66 per share). Richard was allowed to finance purchase of the stock through a financing agreement.

company anymore. Claude also asked Richard and his wife to move out of his house.

In 1996, Claude gave Susan 241 shares of stock and sold another 241 shares to Mike.[4] Following the stock transfer, Mike and Susan collectively held 26.7778% of Miraco. Richard retained his 450 shares and his involvement with the company became one of a minority shareholder only.[5] Richard occasionally attended the shareholder meetings, but usually sent a representative.

In 1998 Claude gifted and sold an additional 242 shares to Mike and Susan. Claude passed away two years later and the management duties seamlessly transferred to Mike and Carter. At this point, Richard still owned 25% of the outstanding Miraco shares, Susan and Mike each owned 26.88%.[6]

On January 2, 2008, the Miraco board of directors (Mike and Susan) held a special board meeting for the purpose of selling the remaining 166[7] shares of treasury stock to key employees. Richard was not given notice of the meeting or the board's intention to sell the 166 shares. The board voted to issue forty-two

---

[4] The terms of the stock sale were identical to the sale of stock to Richard—$1666.67 per share financed at a reasonable interest rate to allow the Miraco dividends to service the payment installments.

[5] Claude wanted Richard to retain the Miraco stock to provide an "income safety net" for Richard and his wife.

[6] In 1998 the shares were divided as follows: Mike—483 shares, Susan—483 shares, Richard—450 shares, Carter—160 shares, others—224 shares, and treasury—200 shares.

[7] After buying back stock from a deceased employee and following Claude's corporate vision, in 2006 Miraco issued fifty-four shares of treasury stock to three key employees.

shares to Mike, forty-two shares to Susan, seventy shares to Carter, and four shares each to three other employees.[8] The district court noted:

> Mike credibly testifies that Claude's corporate legacy instructed the leadership team on the discretion that should be, and was, exercised in stock sales. The purpose of the transfers was to reward loyalty and service, and inspire key employees. Major strides were being made as Miraco modernized, adapted to new technology, and consolidated job descriptions within the corporate office—leading Carter and Mike to take on responsibilities that had historically required a separate employee. In approving of the treasury-stock sales, Miraco officials did not consider how the purchasing employees' ownership interests would affect others' interests, including Richard's.

In 2009, Richard wrote a letter to Mike voicing his dissatisfaction with the decision to issue the remaining treasury shares.[9] Richard requested an additional fifty shares to return his percentage of Miraco stock to his historical 25% amount, as the issuance of the final treasury shares diluted his ownership in the company. Richard also requested a job as a salaried sales representative to service the California and Arizona markets. In another undated letter, Richard requested Miraco provide him and his wife with health insurance. Mike did not respond to either letter.

Richard personally attended the 2010 shareholder meeting to protest the sale of the treasury shares and bonuses received by the Miraco leadership. The district court summed up the meeting:

> Without analysis of the merits of the incentive pay, [Richard] focused on the dividend return he felt had been denied due to

---

[8] The terms of the stock sale were identical to the other stock sales in the past at $1666.67 per share plus a financing agreement.

[9] During this period, Richard's health began to decline and his newly created table business was failing. Richard had pledged Miraco stock as security for loans he took out for his failing table business.

management compensation. Importantly, C.P.A. Tim Baker who was familiar with industry practices, Miraco's financial circumstances, and the enlargement of responsibilities shouldered by Carter and Mike, had actually counseled management on the propriety of the bonuses. Miraco's good performance under Carter's and Mike's leadership was obvious, prompting another shareholder at the same 2010 meeting to verbally endorse the bonus pay. Don Meredith "stated he was extremely happy with the management of Miraco and that bonuses were earned." Thus, despite [Richard]'s protests, Miraco did not retreat from its management course—including its bonus payments.

After the 2010 meeting, Richard approached Mike (followed by a letter) and asked for cash to be withdrawn for him from Miraco's retained earnings. Traditionally, Miraco paid annual dividends consisting of total net earnings. Due to recessionary conditions, in 2009 the company decided to divide its dividend payouts throughout the year in order to retain a measure of earnings to ensure operating cash flow and avoid bank loans. All retained earnings were distributed by the end of the year. Richard's request for $127,000 of those retained earnings was refused. Due to the increasing pressure from creditors for his failing business, Richard resorted to selling off his Miraco stock. From 2010 through 2013 Richard sold 194 shares.

Richard filed suit against Miraco, Carter, Mike, and Susan, alleging breach of fiduciary duty, oppression, and unjust enrichment. At the outset of trial, Richard dismissed Carter and Miraco. He also amended his demands to be:

> Relinquishment by Mike and Susan of a total of twenty-seven shares to restore Richard to 25% ownership (assuming that he had not transferred his own shares);
> Cash payment by Mike and Susan of $44,315.06 for dividends Richard did not collect on the twenty-seven shares (net of the cost of the shares which would have been paid from Richards dividends on them);

Cash payment by Mike and Susan of $56,660 to restore Richard's imputed share of dividends for allegedly excess bonuses Mike received;

Cash payment by Mike and Susan of $120,000 representing two years of employment Richard felt entitled to, but was denied, factored at $60,000 annually and based upon Mike and Susan's receipt of the savings via additional dividend revenue; and

Reimbursement by Mike and Susan to Miraco for their cost of litigation defense.

The district court concluded its findings of fact by stating:

After Richard's audition for being Claude's successor withered, Susan and Mike evolved to be the familial thread in Claude's succession. Along with Carter, Mike emerged as the driving force in shepherding Miraco's growth and enduring success. Richard's fortunes tanked. Remorse over the divergence of his financial course, from that of Susan and Mike in the same time frame, has been projected into dismay over rival corporate savvy and ultimately into a contempt-inspired lawsuit. What fuels this litigation is not corporate mistreatment of a shareholder or a malfeasance in the offices of Miraco management, but human desperation.

The paradox presented in this record is best illustrated in the dramatic series of entreaties when Richard, whose personal, physical, and economic worlds were collapsing, approaches Mike in his role as a Miraco executive, and pleads for corporate charity. Richard implores it as a familial courtesy—something perhaps in the legacy of Claude—a supposed job, healthcare coverage, money, and more stock. But, it probably came as no surprise to Richard at each juncture, that Mike—the seasoned and decisive corporate executive—proceeded in that very managerial vein. After all, it made no financial sense, nor served any company-building purpose, for Miraco to grant any of Richard's demands for economic mercy.

The district court dismissed Richard's claims and assessed him all court costs. Richard now appeals.[10]

---

[10] Richard passed away on June 21, 2014.

## II.    STANDARD OF REVIEW

We review the district court's declaratory ruling de novo since the case was tried in equity.  *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). We defer to the "district court's findings where the credibility of witnesses is a factor in the outcome."  *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 448 (Iowa 1988).  "We will affirm a decree in equity if it can be sustained upon any pleaded basis which is supported by the record, regardless of the basis used by the trial court."  *Citizens First Nat'l Bank v. Hoyt*, 297 N.W.2d 329, 332 (Iowa 1980).

## III.    ANALYSIS

### A.    Breach of Fiduciary Duty

#### 1.    Error Preservation

At trial there was some debate as to whether Richard's breach-of-fiduciary duty claim was a derivative or a direct action.[11]  At the close of Richard's case, Richard's counsel clarified his position by stating that while the claim was pled as a derivative action, Richard was not "standing in the shoes of all shareholders making a derivative claim against the company."[12]  His counsel went on to state their position was this is a "closely-held corporation" case and, since Richard

---

[11] Derivative actions are ones in which shareholders allege that corporate directors harmed the corporation by their acts or omissions, such that the corporation experienced a loss.  *Weltzin v. Nail*, 618 N.W.2d 293, 295 (Iowa 2000); *see also Whalen v. Connelly*, 593 N.W.2d 147, 152 (Iowa 1999) (stating derivative action is challenge to board's managerial power).  They are distinct from direct actions where a plaintiff complains of a loss separate from that of other shareholders or alleges a special duty owed to the shareholder distinct from duties owed to the corporation.  *Ezzone v. Riccardi*, 525 N.W.2d 388, 394–95 (Iowa 1994).

[12] Richard's counsel also made an oral motion to clarify his petition and strike all allegations that could be considered "derivative."

owned a substantial minority of the Miraco shares, he was owed a special duty by the Miraco board. In his post-trial reply brief, Richard noted his claim "falls within one or more of the categories generally appropriate for direct action." He also noted, regardless, the reasons for derivative/direct dichotomy do not apply because Miraco is a closely held corporation.[13] Without delving into Richard's close-corporation claim, the district court decided his claim was for direct action, rather than an individual action for derivative relief.

On appeal, Mike and Susan claim error was not preserved on Richard's individual action for derivative relief, and therefore Richard is barred from raising this claim on appeal. In the alternative, Susan and Mike urge us to view Richard's claim solely as a derivative action and, since it does not meet the requirements for a derivative action, it should be dismissed. We decline this invitation, but find error was not preserved on Richard's individual action for derivative relief because the district court did not rule on the issue and Richard did not file a post-trial motion to preserve this issue on appeal. "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."

---

[13] For this proposition, Richard cites to *Redecker v. Litt*, No. 04-0637, 2005 WL 1224697 (Iowa Court App. May 25, 2005). In *Redecker*, taking a discretionary approach, we allowed an individual action for derivative relief—involving a closely held corporation—where the policy reasons for imposing the requirement of a derivative action were absent. *Id.* at *5–6. The policy reasons to allow an individual suit for derivative relief include: (1) the action will not unfairly expose the corporation to multiple actions, (2) the action will not prejudice the interests of creditors of the corporation, and (3) the action will not interfere with a fair distribution of the recovery amongst all interested persons. *Id.* at *6 (citing American Law Institute Principle of Corporate Governance §701(d)). We also discussed this issue in *Lakes Gas Co. v. Terminal Properties Inc.*, No. 05-1266, 2006 WL 1229934, at *6 (Iowa Ct. App. April 26, 2006), and adopted the same American Law Institute discretionary approach on whether to allow a shareholder to intervene, in its individual capacity, on behalf of a corporation.

*Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)*; see also Freedom Fin. Bank v. Estate of Boesen*, 805 N.W.2d 802, 809 (Iowa 2011) (stating that raising an issue for the first time in a reply brief is insufficient to preserve error on that issue). Following the lead of the district court, we will analyze Richard's claim as one for direct action.[14]

### 2. Merits

"[I]n order to bring an individual cause of action for direct injuries a shareholder must show that the third-party owed him a special duty *or* that he suffered an injury separate and distinct from that suffered by the other shareholders." *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983); *see also Ezzone*, 525 N.W.2d at 394–95. The district court found Richard failed to prove the elements required for a direct action, and therefore he failed to show there was any breach of a fiduciary duty by Mike and Susan. We agree. We adopt the district court's concise conclusions concerning Richard's claim:

> Frustrated expectations of preferential purchase of treasury stock by minority shareholders pro rata, and Richard's other financial demands related to dividend income, are interests that likewise inure to all shareholders who do not wield majority ownership of Miraco. Richard's professed entitlement to employment income and health-insurance coverage does not emanate from his historic involvement with the corporation, nor

---

[14] Richard's claim that he should be able to proceed with individual action seeking derivative relief also fails on the merits since Richard is seeking, in part, individual relief and not solely relief for the corporation as a whole. Both plaintiffs in *Redecker* and *Lakes Gas* sought relief only on behalf of a closely held corporation and not for themselves as individuals. *See Lakes Gas*, 2006 WL 1229934, at *4–5; *Redecker*, 2005 WL 1224697, at *4. Additionally, Richard's claim runs afoul of some of the policy reasons against allowing an individual action for derivative relief. *See Redecker*, 2005 WL 1224697, at *5–6. For example, Richard's action could expose Miraco to a "multiplicity of lawsuits" because there are at least nine other shareholders who could make the same claim as Richard. *Id.* at *6.

from his familial ties with Claude. In addition, Richard's status as a "majority minority" shareholder does not trigger any special fiduciary duties for his benefit, nor particularize to his detriment, the lack-of-opportunity injuries of which he complains.

It is granted that Mike and Susan have close personal and financial interests in the operations of Miraco. Yet, throughout their dealings with, and on behalf of the corporation as directors, their relationship as shareholders and as employees has been open and obvious, and business transactions have been completed with transparency, fairness, and were ultimately approved by other shareholders in due course. No conflict-of-interest liability lies in their actions, which have been shown to be fair to the corporation in all respects. *See* Iowa Code § 490.832.

## B. Oppression

Richard claims the district court erred in failing to find Mike and Susan's actions of issuing treasury stock, granting bonuses to key employees, and denying Richard's request for employment constituted oppression. Recently, in *Baur* our supreme court adopted a reasonableness standard for the evaluation of minority shareholder claims of oppression in Iowa, and stated:

> We adopt today a reasonableness standard for the adjudication of minority shareholder claims of oppression in Iowa. This standard comports with principles announced in our earlier decisions protecting the interests of minority shareholders in closely held corporations. Management-controlling directors and majority shareholders of such corporations have long owed a fiduciary duty to the company and its shareholders. *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 451 (Iowa 1988). This fiduciary duty encompasses a duty of care and a duty of loyalty to the corporation. *Id.* The fiduciary duty also mandates that controlling directors and majority shareholders conduct themselves in a manner that is not oppressive to minority shareholders.

832 N.W.2d at 673–74.

Richard first claims he should be awarded twenty-seven shares of treasury stock to return him to the 25% ownership position he held before the

issuance of the remaining treasury stock. Richard denies his claim is one of preemptive right, but rather his claim is Mike and Susan's oppressive action failed to satisfy his "reasonable expectations." The record shows the issuance of the remaining shares of treasury stock was done to award key employees for their commitment to the company—fulfilling Claude's vision for the treasury stock and his employee ownership ideal. As the district court found, Richard's expectation of a preemptive or preferential right to obtain a certain share of the treasury stock was unfounded. Richard failed to present evidence showing Mike and Susan acted in an oppressive manner toward Richard or the other shareholders.

Second, Richard claims it was reasonable for him to expect his dividends would not be diluted by the increase in compensation to certain employees. On this issue we echo the district court's reasoning:

> Miraco's employer-employee relationship with Carter and Mike supported the officer salaries and additional compensation accomplished through bonuses. The corporation had sought independent C.P.A. counsel in calibrating its executive compensation, and the company acted reasonably in following the advice it received. *See* Iowa Code § 490.830(5)(b). The bonuses paid to Mike and Carter were affordable for Miraco, particularly in consideration of efficiencies captured by management and the resultant increases in workload for the president and vice-president. There is no proof that bonuses pushed total executive pay into a realm that would be objectively seen as out of line for a company with an economic profile like Miraco's.

Finally, Richard claims Mike and Susan unreasonably denied him employment and therefore acted in an oppressive manner. The opposite is true. The record shows Miraco had a contract and a twenty-year relationship with a company to represent its sales in multiple states, including California and

Arizona—employing a salaried salesman in that territory could expose Miraco to litigation. Additionally, Richard's expectation of employment based on his status as a substantial minority shareholder is unreasonable. This exact claim has not been addressed in Iowa, though our supreme court has cited to out-of-state case law supporting this conclusion. *See Baur*, 832 N.W. 2d at 671 (citing *Ford v. Ford,* 878 A.2d 894, 904 (Pa. Super. Ct. 2005) (explaining expectation of lifetime employment was unreasonable absent an express agreement to that effect)).

We affirm the district court's dismissal of Richard's oppression claim.

### C. Unjust Enrichment

Richard claims, without supporting authority,[15] the district court erred by failing to find Mike and Susan ignored their fiduciary duties and unjustly enriched themselves. Richard also claims it is unlawful or inequitable for the company to pay for the pretrial defense of itself and its officers.

The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation. *Credit Bureau Enters., Inc. v. Pelo*, 608 N.W.2d 20, 25 (Iowa 2000). Although it is referred to as a quasi-contract theory, it is equitable in nature, not contractual. *See Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). It is contractual only in the sense that it is based on an obligation that the law creates to prevent unjust enrichment. *See id.* at 29–30. Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1)

---

[15] Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed a waiver of that issue.").

defendant was enriched by the receipt of a benefit, (2) the enrichment was at the expense of the plaintiff, and (3) it is unjust to allow the defendant to retain the benefit under the circumstances. *See Credit Bureau*, 608 N.W.2d at 25; *see also West Branch State Bank v. Gates*, 477 N.W.2d 848, 851-52 (Iowa 1991).

For reasons we have already stated, the record is devoid of proof Mike and Susan breached their fiduciary duty to Miraco and its shareholders, thus Richard's unjust enrichment claim fails. Again, as the district court noted:

> Richard's post-trial charge that it is unlawful or inequitable for the company to pay for the pretrial defense of itself as a corporate body and to defend its officers and directors through trial, ignores the very circumstances and outcome of this litigation. Iowa Code § 490.851(1), *et seq*. Credible evidence vouches for the good faith exercised by Mike and Susan in their acts that were indeed fair to Miraco and served the best interests of both the corporation and its shareholders.

In conclusion, we affirm the district court's dismissal of Richard's claims.

**AFFIRMED.**