J-A11018-19

2019 PA Super 305

| | | |
|---|---|---|
| BARBARA LINDE, IN HER OWN RIGHT AND BARBARA LINDE ON BEHALF OF LINDE CORPORATION | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| SCOTT LINDE, ROBERT L. HESSLING, ROBERT M. MCGRAW, PAUL FEDOR, CHRISTOPHER LANGEL, ALFRED OSTROSKI, MICHAEL BOCHNOVICH, LINDE CORPORATION AND SCOTT LINDE FAMILY'S CORPORATION TRUST | : : : : : : : : : : | No. 754 MDA 2018 |
| Appellants | : | |

Appeal from the Judgment Entered on May 21, 2018
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2013 CV 11028

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

OPINION BY OLSON, J.:                    **FILED OCTOBER 11, 2019**

Appellants, Scott Linde, Robert L. Hessling, Robert M. McGraw, Paul Fedor, Christopher Langel, Alfred Ostroski, Michael Bochnovich, Linde Corporation, and Scott Linde Family's Corporation Trust, appeal from the judgment entered on May 21, 2018.[1]  The judgment was in favor of Barbara Linde (hereinafter "Barbara") and against Appellants in the amount of $5,392,000.00.  We affirm.

_____

[1] On March 27, 2014, the trial court sustained defendant Linde Corporation's preliminary objections to the complaint and struck the claims against the corporation.  Trial Court Order, 3/27/14, at 1.  This determination has not been challenged on appeal.

On September 18, 2013, Barbara, individually and on behalf of Linde Corporation (hereinafter "LindeCo"), filed a complaint against a number of defendants, including: her brother, Scott Linde (hereinafter "Scott"); the Scott Linde Family S Corporation Trust; and, six individual employees and directors of LindeCo. We refer to the six individual employees and directors as, collectively, the "Six Key Employees." They are: Robert L. Hessling, Robert M. McGraw, Paul Fedor, Christopher Langel, Alfred Ostroski, and Michael Bochnovich. **See** Barbara's Complaint, 9/18/13, at ¶¶ 1-10.

Within the complaint, Barbara averred that LindeCo is a Subchapter S corporation[2] and that, at the time LindeCo was formed, she and Scott were its only shareholders. **See id.** at ¶¶ 11-12. Throughout the life of LindeCo, Barbara has been a minority shareholder and Scott has been the majority shareholder of the company. Further, Barbara "was secretary . . . , served as a director[,] and was employed by" LindeCo; Scott is the president and a director of the corporation. **Id.** at ¶ 11 (some capitalization omitted).

Barbara averred that, in March 2012, Scott "demanded that Barbara [] either liquidate her shares[] or immediately sell her shares [of LindeCo] at a

---

[2] In a Subchapter S corporation, "all gains and losses pass through the corporation to the individual shareholders [on a *pro rata* basis]. Thus, [the income is subjected to only one level of taxation and] any [] tax liability is the responsibility of each shareholder, to be computed at that shareholder's marginal rate." **In re Dobson's Estate**, 417 A.2d 138, 143 (Pa. 1980) (footnote omitted); **see also** 26 U.S.C. §§ 1361-1379; **Gitlitz v. Comm'r of Internal Revenue**, 531 U.S. 206, 209 (2001).

price determined by him. If she refused, he stated that he would 'economically destroy her.'" *Id.* at ¶ 22. Barbara refused Scott's demand. *Id.* at ¶ 23. Thereafter, on March 9, 2012, Scott called a special shareholders' meeting, where he: "amended the articles of incorporation to eliminate cumulative voting,[3] amended the by-laws of the corporation, removed the entire board of directors, including [Barbara], and elected new directors[, which excluded Barbara]." *Id.* at ¶ 24 (some capitalization omitted). The new directors included the Six Key Employees and "[t]he new directors subsequently terminated [Barbara's] employment with the corporation, cancelled her medical insurance, the medical insurance of her daughters[,] and eliminated other benefits historically enjoyed by her." *Id.* at ¶¶ 24-25 (some capitalization omitted).

---

[3] In cumulative voting, the voting shareholder "multipl[ies] the number of votes to which he may be entitled by the total number of directors to be elected;" the shareholder may then "cast the whole number of his votes for one candidate or he may distribute them among any two or more candidates." *See* 15 Pa.C.S.A. § 1758(c)(1). "The election of corporate directors through cumulative voting is designed to give minority shareholders with a substantial number of shares some representation on the board of directors." 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 3:20. It "enables substantial minority shareholders to place 'watchdogs' on the board who can report to minority shareholders the actions of directors elected by majority interests." *Id.* "Cumulative voting is to be contrasted with 'straight voting,' a system of voting under which a shareholder is entitled to cast one vote per share for a candidate for each position to be filled on the board. Under a system of straight voting, holders of a bare majority of shares with voting power can elect the entire board of directors." *Id.*

Barbara alleged that the elimination of cumulative voting "was fundamentally unfair and oppressive to [her] as the minority shareholder of the corporation and was undertaken for the sole purpose of eliminating [Barbara] as a member of the board of directors, thereby limiting her access to [corporate] books and records." *Id.* at ¶ 26 (some capitalization omitted). Moreover, Barbara alleged that Scott and the Six Key Employees committed other acts that were oppressive to her as a minority shareholder, such as: "systematically excluding her from a meaningful role in the corporation" by eliminating her as a board member, an officer, and an employee; authorizing deals with closely related companies that had the sole purpose of economically harming her; and, "caus[ing LindeCo] to report a taxable gain which flow[ed] through to [Barbara], but contrary to past practice, [the board] refused to allow the company to make a cash distribution to shareholders which would [have] allow[ed Barbara] to pay her tax obligation." *Id.* at ¶¶ 29-35 and 38-44.

Barbara's complaint contained five counts. The first count, entitled "Breach of Fiduciary Duty," was filed against Scott. Within this count, Barbara alleged that Scott was liable to her for "engag[ing] in a course of conduct that was contrary to law, was oppressive, was a gross abuse of his authority and discretion[,] and was designed to squeeze [Barbara] out of the corporation, and to 'economically destroy her.'" *See id.* at ¶ 14. She requested that the trial court:

    A. Appoint a custodian for [LindeCo];

B. Enter an order directing [Appellants] to grant [Barbara] all of the rights, benefits[,] and privileges she enjoyed prior to the illegal actions of March 9, 201[2]; []

C. Award [Barbara] compensatory damages for her loss of income and benefits . . . ;

. . .

E. Direct [Appellants] to provide [Barbara] immediate access to the books and records of [LindeCo] . . . and all other partnerships or corporations owned or controlled by [Scott] doing business with [LindeCo]; and

F. Grant such other and further additional relief as the court may deem to be appropriate and just under the circumstances.

*Id.* at "Wherefore" Clause for Count I (some capitalization omitted).

In other counts, Barbara alleged that the Six Key Employees "aided and abetted [Scott] in the breach of the fiduciary duties owed to Barbara [] as a minority shareholder" and that Scott and the Six Key Employees engaged in a civil conspiracy to harm her. As to these claims, Barbara requested that the trial court "enter[] judgment in [Barbara's] favor and against [Scott] and the [Six Key Employees] for the full amount of her damages . . . and grant such other and further relief as the court may deem just and equitable." *See id.* at "Wherefore" Clauses for Counts IV and V. Finally, Barbara requested that the trial court remove Scott from his positions as officer and director of LindeCo and that the court appoint a custodian for LindeCo. *See id.* at "Wherefore" Clauses for Counts II and III; *see also* 15 Pa.C.S.A. §§ 1726(c) (authorizing the judicial removal of a director); 1767(a)(2) (authorizing a

court to appoint a custodian for a corporation). As with her other claims, Barbara included general prayers for relief at Counts II and III. Barbara's Complaint, 9/18/13, at "Wherefore" Clauses for Counts II and III.

On the same date that Barbara filed her complaint, Barbara also filed a separate "Motion for Appointment of Custodian." Within this motion, Barbara repeated the allegations contained in her complaint and requested that the trial court appoint a custodian for the corporation. Barbara's Motion for Appointment of Custodian, 9/18/13, at ¶ 3. The trial court then scheduled a hearing on Barbara's Motion for Appointment of Custodian. Trial Court Order, 9/18/13, at 1.

The six-day hearing on Barbara's Motion for Appointment of Custodian took place on April 29 and April 30, 2014, July 22 and July 23, 2014, and August 27 and August 28, 2014. On December 31, 2014, the trial court denied Barbara's Motion for Appointment of Custodian. Trial Court Order, 12/31/14, at 1.

After the trial court's December 31, 2014 order, the parties agreed to submit the record, as developed during the hearing on Barbara's Motion for Appointment of Custodian, to the trial court for adjudication of the entire complaint.[4] Trial Court Opinion, 11/13/15, at 2; Appellants' Brief at 11. On

---

[4] The procedure the parties agreed to was similar (but not identical) to a case submitted on stipulated facts. Pennsylvania Rule of Civil Procedure 1038.1 declares: "[a] case may be submitted on stipulated facts for decision by a judge without a jury. The practice and procedure as far as practicable shall

be in accordance with the rules governing a trial without jury." Pa.R.C.P. 1038.1. The comment to Rule 1038.1 states: "[t]he parties may submit a stipulation of facts to the court for its decision. The procedure then follows an existing model, that of a nonjury trial with respect to the decision, post-trial practice and appeal." Pa.R.C.P. 1038.1 cmt. In interpreting this rule of civil procedure, our Supreme Court has held:

> It has long been the law of this Commonwealth that an appeal does not lie from a decision of a trial court following the submission of a case on stipulated facts. The decision of the trial court under these circumstances is considered to be similar to a verdict in a jury trial from which the aggrieved party must file a motion for post-trial relief pursuant to Pa.R.Civ.P. Rule 227.1, in order to preserve disputed issues for appellate review. Those issues not raised in a motion for post-trial relief following a trial on an agreed stipulation of facts are deemed waived.

*McCormick v. N.E. Bank of Pa.*, 561 A.2d 328, 330 (Pa. 1989) (some citations omitted); *see also Miller v. Kramer*, 621 A.2d 1033, 1035 (Pa. Super. 1993) ("[t]his [C]ourt has always considered an adjudication based upon a stipulated set of facts to constitute a trial and subject to Rule 227.1(c)").

The procedure followed in the case at bar is even more analogous to a traditional bench trial than that outlined in Rule 1038.1, given the parties requested that the trial court make both factual findings and conclusions of law from the record evidence before it. *See Triage, Inc. v. Prime Ins. Syndicate, Inc.*, 887 A.2d 303, 306 (Pa. Super. 2005) ("[w]hen a case is submitted on stipulated facts, the rulings of the trial court are limited to questions of law"). Therefore, since a case submitted on stipulated facts constitutes a trial following which post-trial motions must be filed, the procedure followed in the case at bar must also constitute a trial.

November 13, 2015, the trial court entered its findings of fact, conclusions of law, and decision regarding liability.[5]   As the trial court explained in detail, the evidence presented for its consideration consisted of the following:

> The Linde family has been involved in construction and industry in northeast Pennsylvania for approximately 50 years, when brothers Scott and Eric Linde began Linde Enterprises with their father.  Scott and Eric's sister, Barbara Linde, was offered a share in Linde Enterprises by her father a few years after she completed school.  In 1988, the Linde siblings' father passed away, and his shares in Linde Enterprises were distributed to his children such that Scott and Eric each owned 3/7 of the company and Barbara owned the remaining 1/7; Barbara testified that this structure was essentially her father's way of ensuring that any two of the siblings could overrule the third.  Eventually, legal issues involving the Linde siblings arose, beginning a series of lawsuits in Wayne County, Pennsylvania.
>
> In 2006, Scott and Barbara formed their own entity, [LindeCo].   Scott and Barbara set up LindeCo as an S-Corporation, with 1000 shares authorized; only 500 of these shares were issued, with 375 (75%) going to Scott and 125 (25%) going to Barbara.  There was no shareholders' agreement.  The corporate bylaws called for cumulative voting.  Scott was the President of LindeCo, and Barbara was the Secretary.  In its first year of operation, LindeCo brought in approximately six million dollars of gross revenues[.][fn.5] [The organization grew steadily and,] by 2012, LindeCo's revenue was approximately [72] million dollars.[fn.6]  As of 2014, LindeCo had approximately 300 employees.  From its

---

[5] Count III of Barbara's complaint demanded that the trial court appoint a custodian for LindeCo.  Barbara's Complaint, 9/18/13, at ¶¶ 45-46.  Since this claim was identical to that contained in Barbara's Motion for Appointment of Custodian, the trial court ruled that its earlier denial of Barbara's Motion for Appointment of Custodian was the law of the case.  *See* Trial Court Opinion, 11/13/15, at 16.  Thus, the court held, the trial was limited to the remaining four claims in Barbara's complaint.  *Id.*

inception until 2012, Barbara received an annual distribution from LindeCo sufficient to pay her state and federal taxes; otherwise, LindeCo has not made any payments of dividends to its shareholders.

[fn.5] LindeCo's initial profits stemmed largely from taking over the clients and accounts of Linde Enterprises.

[fn.6] Although LindeCo's revenue was consistently in the tens of millions of dollars, the company's recorded profit was generally in the $250,000[.00] to $500,000[.00] range; Scott testified that this was due to the high cost of subcontracting and completing each particular job in comparison to the value of the contract for the job.

In addition to Linde Enterprises and LindeCo, Scott was involved in a number of entities affiliated with those two companies. Among these entities were NEV (which is owned in equal sevenths by Scott, Barbara, and five of the [Six Key Employees]), Old Boston (which is owned in equal sixths by Scott and five of the [Six Key Employees]), BSL (owned equally by Barbara and Scott), TRSL, Forest City Partners, and Linde International. Each of these entities has the primary purpose of purchasing equipment and then renting it to LindeCo. . . .

Soon after the formation of LindeCo, the relationship between Barbara and Scott soured. The facts regarding the start of these disagreements are disputed. In the spring of 2007, Scott offered Barbara a shareholder's agreement, which would have provided for the elimination of cumulative voting and an automatic buyout of Barbara's shares at book value upon her termination as an employee of the company. Barbara rejected this offer, because she felt that cumulative voting "allow[ed her] to have a place on the board of directors and receive financial information" and that LindeCo's book valuation significantly undervalued the company.[fn.7] Ultimately, the deal was unacceptable to Barbara both when it was offered and at the time of testimony. . . .

[fn.7] Barbara stated that this is because she and Scott "controlled the bottom line and the value [of LindeCo] for tax purposes" meaning that any present book value "doesn't reflect the true value of the company going

forward." Scott was cross-examined on various assets that may be possessed by LindeCo and related companies but not reflected in the companies' book value.

Barbara testified that, in 2007, Scott was engaging in an intimate relationship with a female employee at the office, and that when Barbara voiced her objections to the relationship to Scott, he "physically picked [Barbara] up out of [her] seat, threw [her] against the wall, picked [her] up again and threw [her] onto the floor;" saying that "he wanted [Barbara] out of his life and that he would destroy [her]." Scott adamantly denied that he had a romantic relationship with the employee, stating that Barbara entered his office and yelled at the employee, telling her to leave; Scott stated that, after he asked Barbara to leave his office multiple times to no avail, he "took her by the wrists, not hard, she stood up . . . [and] when [he] pushed back [to the door] . . . she fell on her derriere, didn't get hurt." Scott states that he did not threaten to "destroy her" but that he later informed his sister that certain business decisions she was making would "economically destroy her." Barbara and Scott have not spoken directly to each other since this incident. Barbara states that Scott has exerted pressure on other members of LindeCo to not speak to Barbara, take her suggestions, or allow her to participate in the business; Scott and the individual defendants deny this.[fn.8]

> [fn.8] For instance, Paul Fedor stated that at no time did Scott ask him [not to] communicate with Barbara, and that he [chose] not to accept any calls or emails from [Barbara] "[b]ecause of the situation. [Because s]he sued [him]."

As an employee of LindeCo, Barbara was responsible for dealing with OSHA claims[,] developing the company's safety protocol, working with the company's computer networks and other infrastructure, and otherwise dealing with the middle-management aspect of the company. What this meant in practice is the subject of no small dispute. Barbara testified that, in the early days of LindeCo, she, as part of a small team, developed a comprehensive system that allowed the company to track its monthly financial information and generate documents that "ultimately fed into the preparation of [LindeCo's] year end certified audit [that were given] to all

the banks and bonding companies . . . if, in fact, they were to request [them]."  Barbara estimated that LindeCo had approximately five OSHA violations from its inception in 2006 [until] her dismissal . . . , and that "every time one came up, [she] handled it."  Alfred Ostroski stated that he reviewed all OSHA violations when they were reported to the company, and then Barbara represented the company at the relevant hearings.  Barbara stated that she was additionally involved in the creation of LindeCo's safety program; Christopher Langel suggested that Barbara may have had input through the mid-2000s but that she was not involved with the physical writing of the document, and that ultimately LindeCo's 2011 safety manual was written by a third party and that Barbara had no involvement with it.

[Appellants] provided a different characterization of Barbara's employment.  Paul Fedor stated that "[Barbara's] involvement in the growth of Linde Enterprises . . . up through [LindeCo] until she was terminated . . . [was] minimal."  Christopher Langel testified that Barbara's office was visible from his, and that "other than [for] management meetings . . . [he] saw Barbara in her office . . . very minimally."  Robert McGraw stated that, "as a highly paid component of [LindeCo], what the company gets out of [Barbara's work] is nothing . . . we're not getting any net return on [Barbara's salary]."

As an employee of LindeCo, Barbara received a salary of approximately $120,000[.00] with an additional $100,000[.00] in benefits.  Among the benefits received were health insurance, vehicles for personal use, credit, and landscaping and maintenance care provided for Barbara's home and property.  Fedor described how the maintenance work involved a great deal of work caring for Barbara's horses and "elaborate stable system," which took two people, one of whom worked at least a few hours seven days a week, to maintain.  The testimony suggested that Scott enjoyed some similar services but to a smaller degree.

In 2010, Scott, worried about the possibility of key LindeCo employees leaving to work for competitors, decided to create a profit-sharing system to award a select few with equity in the company; all parties agreed that LindeCo could not survive if multiple key employees left.[fn.9]  Scott stated that

"it was [his] idea and . . . decision as president and majority stockholder [of LindeCo] to have those six people who were . . . absolutely critical to the company to become directors. To become directors they had to become stockholders." Scott and these [Six Key Employees] agreed that the best method of doing this would be an issuance of stock.

> [fn.9] Indeed, Defendant Alfred Ostroski testified that he declined a job offer from a competitor specifically because of Scott's offer to become a shareholder in LindeCo.

Barbara was not opposed to the [Six Key Employees] becoming directors[fn.10] or joining in a profit-sharing plan – in fact, she believed "it needed to be done to solidify [LindeCo's] management" – but she did not agree that the issuance of shares of LindeCo stock was the best method, stating that an issuance of stock would have a number of "down sides and tax ramifications" for both LindeCo and the . . . [Six Key Employees]. Upon learning of Scott's plan to issue stock, Barbara discussed a number of options with LindeCo's accountants [at] ParenteBeard, including the issuance of phantom stock or other bonus plans. Eventually, at the end of 2011 or beginning of 2012, ParenteBeard gave a presentation to the [Six Key Employees] regarding the alternatives to Scott's proposed stock issuance. Alfred Ostroski testified that Barbara "told us [Six Key Employees] that if this went through and we became stockholders that she would sue us individually."

> [fn.10] In fact, Barbara voted for the [Six Key Employees] to become directors during an April 13, 2010 management meeting, to "show[] them a level of financial information that would allow them to govern from the board." Barbara later found out that the minutes of this meeting had never been filed and that the members of the [Six Key Employees] had declined positions on the board. Multiple members of the [Six Key Employees] stated that this was because they did not wish to become involved in the worsening relationship between Barbara and Scott.

Barbara stated that, ultimately, Scott refused to give the [Six Key Employees] any choice in the type of compensation they received and that they were afraid to speak up in

disagreement with Scott; Scott argued that he and the [Six Key Employees] were in complete agreement about the desirability of the proposed stock plan,[fn.11] and that Barbara's suggestions of drawbacks were a pretext to block the implementation of the plan, which would have diluted her share of LindeCo. Scott formally proposed variations on the plan *via* email in both September 2011 and December 2011, but Barbara did not sign the proposals. Ultimately, Barbara never acquiesced to the proposed stock issuance; in 2012 LindeCo issued two years' worth of bonuses to the [Six Key Employees], which they then used to buy a combined 50 of Scott's 375 shares (four of the [Six Key Employees] purchased ten shares and two purchased five shares at book value of $6,200[.00] each).[fn.12,] [fn.13] These shares were sold with an agreement that, if any of the [Six Key Employees] left the company, they would be compelled to sell their stock back at the most recent year's book value.

[fn.11] Paul Fedor testified that he "prefer[red] to take the risk" associated with stock as opposed to other, more direct profit sharing plans, because he "[didn't] need the money right now . . . [and] was looking for a [long term] investment." Robert McGraw echoed this sentiment, stating that "from [his] point of view . . . [he didn't] need [the] money right now" and that he "was looking for the end game."

[fn.12] Scott stated that, although he felt it necessary "after two years of [LindeCo] not meeting [its] obligation, [to] do what [he] had to do," the eventual solution "was bad for the company . . . was bad for the employees . . . it was just a bad decision." Scott explained that this was partially because of the cost to the company in terms of bonuses; had the 50 shares received by the [Six Key Employees] been newly authorized, the bonus issued to receive them would only need to consist of the taxes owed on their value; whereas purchasing them from Scott required a bonus issuance equal to the taxes owed plus the book value of the stock.

[fn.13] Alfred Ostroski testified that, between the time the [Six Key Employees] purchased the stock in LindeCo and August 2014, the overall company value had increased by approximately $1.25 million, meaning each

- 13 -

share increased approximately $2,000[.00] to $2,400[.00] in value.

From 2010 to the middle of 2011, LindeCo's management meetings, historically attended by Barbara, Scott, and the [Six Key Employees], became less and less frequent, and the widening rift between Barbara and Scott came to a head in late 2011 when Scott sent Barbara an email on December 16, 2011 purporting to call a meeting of LindeCo's shareholders just six days later on December 22, 2011. The agenda was to include a vote on proposed amendments to LindeCo's by-laws, including the elimination of cumulative voting. Barbara testified that, when she received this email, she "went to the by-laws and ascertained that it was the [LindeCo] secretary's job to call the meeting." Additionally, LindeCo's by-laws required at least ten days' notice before any proposed change to the by-laws. Barbara objected to the meeting taking place on December 22, and rescheduled it to March 9, 2012. At the March 9, 2012 shareholders' meeting, LindeCo's shareholders – that is, Scott, over Barbara's objection[fn.14] – voted to [amend the by-laws to] eliminate cumulative voting[,] change the role of the corporate secretary, [and] give the majority shareholder the power to remove the entire board of directors[. Scott then removed the board of directors and] replaced the board of directors with Scott and the [Six Key Employees]. At a Special Meeting of the Board of Directors, held on March 14, 2012, the new board voted to dismiss/reelect corporate officers; Barbara was not elected to any position. It was Scott's opinion that Barbara, no longer a director or officer of LindeCo, had been "terminated as an employee in March of [2012]."

> [fn.14] Barbara introduced official objections to the proposed shareholder actions to be voted on at the March 9, 2012 meeting, objecting to the following effects of the proposal: "Circumvents the proper role of the secretary . . . [;] seeks to change quorum requirements for the transaction of business . . . [;] permits the transaction of business in the absence of a quorum . . . [;] shareholder [cumulative] voting withdrawn . . . [;] restrict[ion of] the power of minority interests to fill vacancies on the board of directors . . . [; and,] empower[ing] the single majority shareholder to remove the entire board without cause."

Barbara characterized these proposed amendments as "serv[ing] no other purpose than to subordinate the board of directors to the whims of a single majority shareholder by changing the way in which board members are replaced."

Even though Scott viewed the events of the March [2012] meeting[s] as effectively terminating Barbara, LindeCo offered Barbara what was essentially a severance package shortly afterwards. This package would have allowed Barbara to "withdraw up to $5,000[.00] per week from her equity in [LindeCo], approximately 25 percent of $3 million equal to $750,000[.00] equal to 150 payments plus future year profits."[fn.15] Scott stated that Barbara didn't respond to the offer, which he considered a starting point in negotiations, and "did nothing, continued to get a salary, continued to charge things, didn't come to the office, [and] didn't talk to people" for approximately seven months after the offer was made. . . .

[fn.15] The $750,000[.00] represented an estimated book value of $6,000[.00] per share for each of Barbara's 125 shares. Scott acknowledged that "of course [Barbara] would want" her shares to be bought out at fair value, but to determine fair value the company would "be off on another half a million dollars figuring out what that is."

[Barbara testified that her removal from the board and from her position as secretary made it so that she was "no longer allowed to have access to any financial information, other than [year-end] financials;" she testified that "[i]t was impossible for [her] to do [her] job without financial information." Further, Barbara testified that, after her removal from the board: she was "denied access entirely" to the LindeCo computer system; "all of [her] belongings were removed from [her] office" and she was not permitted back into her office; and, "[n]o one [at LindeCo] would speak to [her], no one would reply to [her] emails."]

Barbara was officially terminated as a LindeCo employee on October 31, 2012.

[Barbara testified that her termination devastated her financially. This included: the loss of her annual, $120,000.00 salary; the loss of medical benefits for her and her children; and, the loss of additional benefits of approximately $100,000.00 per year. Barbara also testified that Scott and the Six Key Employees financially harmed her in other ways; specifically, by looting related companies in which she had an ownership interest.] . . . For instance, although Barbara is still a shareholder in Linde Enterprises, she states that she has not been able to withdraw any money from that company "because Scott had stripped all the cash and equipment from that company." . . . [As to this,] Barbara calls attention to a transaction made at a meeting of Linde Enterprises in December 2012 that arose out of two preexisting promissory notes. The first note, dating from October 1, 2010, obliged LindeCo to pay Linde Enterprises the sum of $1,516,200[.00]. On May 25, 2012, LindeCo borrowed an additional $1.2 million from Linde Enterprises, repayable over 119 months. The note was signed by Robert Hessling for LindeCo and Scott for Linde Enterprises.

Due to the ongoing disagreements between Eric, Scott, and Barbara regarding Linde Enterprises, the three siblings met on December 3, 2012, at which time Scott offered to purchase the shares of both Eric and Barbara, which they declined. At a December 11, 2012, meeting of the LindeCo board of directors, at which Barbara was not present, [Scott] caused Linde Enterprises to purchase 319 of Scott's 320 shares in Linde Enterprises, which were held in the Scott F. Linde Family S Corporation Trust. In exchange, Linde Enterprises assigned to the Scott F. Linde Family S Corporation Trust both the entire $1,148,796.70 remaining to be paid on the May 25, 2012 note and a portion of the October 1, 2010 note, in the value of $291,721.60, for a total of $1,440,518.30. The Trust, through Scott, then made immediate demand on the assigned notes and was paid by LindeCo. Barbara alleges that the value at which Scott's shares in Linde Enterprises were to be purchased was determined unilaterally by Scott himself,[fn.16] and ultimately that this transaction was designed to drain cash from Linde Enterprises by preventing it from collecting on its notes, thus depriving Barbara of what was at that point her primary source of funds. Scott stated that the value of the stock was determined by a shareholder's agreement that set the price

of any stock purchased by Linde Enterprises at book value as of the prior December 31, and that said value was determined by the previous year's financial report. Commenting on this deal, Robert McGraw testified that he approved this transaction because it "got debt off of the balance sheet" and that he was satisfied that the financial aspects of the transaction were beneficial to LindeCo. McGraw stated that he did not consider the impact this transaction would have on Barbara, and did not consider whether the money paid was a fair value for Scott's shares in Linde Enterprises because it had "nothing to do with what [the Board was] voting on." Christopher Langel added that the transaction helped disentangle LindeCo from the "turmoil" surrounding Barbara, Eric, and Scott's "struggle for the management of [Linde] Enterprises."

> [fn.16] Paul Fedor testified that he relied on Robert Hessling's assurances regarding valuations in deciding to vote for this transfer.

Barbara also suggests that Scott caused Linde Enterprises to sell off its assets, which consisted primarily of construction equipment that was necessary to function as a contractor. There was some dispute about the number and value of the pieces of equipment held by Linde Enterprises; Barbara suggested that, in October of 2012, Linde Enterprises owned approximately 80 pieces of equipment totaling $600,000[.00] to $700,000[.00] in market value,[fn.17] whereas [Appellants] contend there [were] 30 pieces worth $200,000[.00] to $300,000[.00]. What is not disputed is that approximately 30 pieces of equipment were put up for sale on an online auction site; with the exception of a single tractor, all of this equipment was purchased by LindeCo. Many of the items received upwards of 20 bids and sold for well over the starting price; ultimately, the pieces sold for a combined $174,900[.00]. Again, Barbara contends that this was a naked attempt to strip Linde Enterprises - and thus Barbara herself - of its ability to make money and provide [her with] a source of income. Barbara testified that the proceeds from this sale did not end up with Linde Enterprises, and that she doesn't know where the proceeds ultimately went. Paul Fedor, who was in charge of purchasing the equipment, also did not know where the proceeds from the sale ended up.

- 17 -

[fn.17] This valuation is based on an appraisal by a third party named Hunyady.

Similarly, Barbara has accused Scott of controlling which of his many enterprises LindeCo contracts with, and has improperly diverted work from Linde-affiliated entities that Barbara co-owns to entities that she does not own. Robert McGraw testified that the decisions to purchase equipment, including deciding which entity was to own a particular piece of equipment, were generally made by Scott. McGraw denied that rental or purchasing decisions were based on the particular owners of the various entities, but did admit that "in the short term" more equipment has gone into Old Boston, of which Barbara is not a part-owner, than NEV, [which is owned, in part, by Barbara]. As early as 2005, Barbara was concerned that particular jobs were going to Linde International, in which she did not hold shares, rather than other companies under the Linde umbrella. Christopher Langel testified that certain companies would receive certain jobs for reasons related to unions, but that he understood why Barbara would be in "opposition to work being sent to [an] entity of which she didn't have an interest." Scott testified that different entities were targeted to different markets, and that Linde International was the primary company for jobs more than 75 miles from LindeCo headquarters. Regarding BSL, the company owned equally by Barbara and Scott, Scott stated that, although Barbara never blocked equipment from being bought by BSL, "[t]he problem is when you go to [Barbara] and you go to get a bank financing statement, she wants her house off, she wants this, she wants to talk to them, she wants everything . . . she didn't bring any equipment to be put in there. She never mentioned to me that I have this piece, I found this piece, I want to buy it there."

It is clear from the facts of this case as described above that the disagreements between Barbara and Scott are pervasive, infecting the business of LindeCo and causing a great amount of distress to all parties involved.

Trial Court Opinion, 11/13/15, at 1-16 (citations and some capitalization and footnotes omitted).

From this evidence, the trial court found the following:

- LindeCo, as a company, "appears to be rather healthy" and "has been well-managed." *Id.* at 18-19.

- LindeCo is "run primarily by Scott . . . [and Scott's] removal from the LindeCo board of directors would be devastating to the company and would harm the interests of all stockholders, including [Barbara]." *Id.* at 22.

- Although the company has been well-managed, Scott, as the majority shareholder, "has not always protected the interests of the company's minority shareholder, Barbara." *Id.* at 19.

- Scott's "elimination of cumulative voting, followed by the dismissal of the entire board of directors and reappointment of the entire board minus Barbara" was "motivated in part by [his] animus against Barbara." *Id.*

- "Barbara's dismissal from the board of directors and, ultimately, from the company, was designed to prevent Barbara from attaining LindeCo's financial information, to keep her out of the premises, and to get her out of [Scott's] life." *Id.*

- Scott's "diminution [of] Barbara's role in the company and access to company financial records" constituted "oppressive conduct" and a squeezing-out of the minority shareholder, Barbara, from LindeCo. *Id.*; Trial Court Opinion, 9/20/18, at 17 n.14.

- Further evidence of Scott's oppressive conduct towards Barbara is found in: the unaccounted-for purchase, by LindeCo, of assets that were owned by Linde Enterprises (a company that Barbara co-owned), which "strip[ped] Linde Enterprises - and thus Barbara herself - of its ability to make money and provide [Barbara with] a source of income" and, the 2012 payment, authorized by LindeCo's board of directors, to the Scott F. Linde Family S Corporation Trust, of approximately $1.4 million. The latter event occurred after Scott caused Linde Enterprises to purchase almost all of his shares in Linde Enterprises in exchange for Linde Enterprises' assignment – to the Trust – of the amount that LindeCo owed Linde Enterprises under certain promissory notes. Trial Court Opinion, 11/13/15, at 19-20; Trial Court Opinion, 9/20/18, at 17 n.14.

- On March 14, 2012, "the LindeCo board of directors, which consisted at that time of Scott [and the Six Key Employees], removed Barbara from her position as LindeCo secretary, effectively cutting off her access to financial information, and caused her over the coming months to be removed from her office and terminated as an employee." Trial Court Opinion, 11/13/15, at 23-24.

- "[T]he entire board of directors, from the time the board consisted of Scott and the [Six Key Employees] onward, engaged in a course of conduct that effectively [squeezed] Barbara [] out of LindeCo." *Id.* at 24.

- The Six Key Employees "did aid and abet Scott [] in his breach of the fiduciary duty he owed to the shareholder Barbara . . . and thus the [Six Key Employees], in their capacity as members of the LindeCo board of directors, are liable for any damage caused to Barbara [] by the breach." *Id.*

- "[T]he evidence supports a finding of civil conspiracy against Scott [] and each of the [Six Key Employees]." *Id.* at 25.

The trial court thus concluded that: Scott breached his fiduciary duties to Barbara; the Six Key Employees aided and abetted Scott's breach of his fiduciary duties to Barbara; and, Scott and the Six Key Employees engaged in a civil conspiracy to harm Barbara. Trial Court Order, 11/13/15, at 1-2. The trial court then *sua sponte* ruled that Barbara was entitled to the remedy of having her shares in LindeCo bought out, by Appellants, at fair value. *Id.* at 2. However, the trial court ruled that it could not "make a proper determination of the fair value of [Barbara's] shares of LindeCo based upon the record before it." Trial Court Opinion, 11/13/15, at 21. The trial court ordered further discovery and a later evidentiary hearing, limited to the valuation issue. *Id.*; *see also* Trial Court Order, 11/13/15, at 2.[6] Thus, in

---

[6] We note that, following the liability phase of the proceeding, Appellants filed a motion entitled "motion for post trial relief." Appellants' Motion for Post-Trial Relief, 12/1/15, at 1-5. Within this motion, Appellants claimed that they were entitled to a judgment notwithstanding the verdict ("JNOV") with respect to the trial court's finding of liability on all claims. *See id.* As is relevant to the current appeal, Appellants raised the following claims. First, they claimed that

effect, the trial court *sua sponte* reopened the case and bifurcated it into liability and damages phases.[7]

The trial court held the damages phase of the trial on August 28 and August 29, 2017. During this time, the trial court heard testimony from: Barbara's valuation expert, Gregory Cowhey; Appellants' valuation expert, John Stoner; and, Scott. **See** N.T. Trial, 8/28/17 at 1-277; N.T. Trial, 8/29/17, at 277-327. The trial court entered its opinion and decision in the matter on December 28, 2017. It ruled that Barbara's shares had a fair value of $4,433,000.00 and that Barbara was entitled to $959,000.00 in interest; the trial court ruled that Barbara was entitled to a total award of $5,392,000.00.

_____

the trial court erred when it found that Scott breached his fiduciary duty to Barbara because: "[t]here is no evidence of record that [Scott's] actions as president and majority shareholder of [LindeCo] were for his own self interest and not in the best interest of all of the shareholders of [LindeCo];" "[t]he record is devoid of any illegal, oppressive[,] or fraudulent acts by [Scott] against [Barbara];" and, "[t]he court ignored the facts and evidence that the actions of [Appellants] were within the Business Judgment Rule." **Id.** at 3-4 (some capitalization omitted). Appellants also claimed that the trial court erred in finding for Barbara on her aiding and abetting and civil conspiracy claims because "the [Six Key Employees] were not shareholders of [LindeCo] at the time of the shareholder's meeting on March 9, 2012." **Id.** at 4 (some capitalization omitted).

[7] During the first phase of the trial, the trial court heard evidence on liability and Barbara's compensatory damages. Thereafter, the trial court convened a second phase of the trial, limited to the valuation of Barbara's shares in LindeCo, which was the trial court's chosen, equitable remedy in this case. We treat this as a bifurcation of the trial for procedural and issue preservation purposes. **See infra** at **24-26 n.7.

Following the denial of Appellants' post-trial motion, Appellants filed a timely notice of appeal to this Court. Appellants raise six claims on appeal:

1. Did the lower court commit an abuse of discretion and err as a matter of law when it found that Defendant, Scott Linde, breached his fiduciary duty and had frozen Plaintiff, Barbara Linde, out of [LindeCo], and refused to apply the Business Judgment Rule to Scott Linde's conduct[?]

2. Did the lower court commit an abuse of discretion and err as a matter of law when it found that the [Six] Key Employees aided and abetted Defendant, Scott Linde, in the breach of his fiduciary duties but refused to apply the Business Judgment Rule to the [Six] Key Employees' conduct[?]

3. Did the lower court commit an abuse of discretion and err as a matter of law when it found that Defendant, Scott Linde and the [Six] Key Employees engaged in a civil conspiracy to freeze Barbara Linde, out of [LindeCo?]

4. After Plaintiff, Barbara Linde, had rested and the record was closed on August 28, 2014, did the lower court commit an abuse of discretion and err as a matter of law when it ordered an evidentiary hearing to determine the fair value of Barbara's shares in [LindeCo] since Barbara never asserted a claim or cause of action in the complaint to be bought out of [LindeCo] as a minority shareholder or as a dissenting shareholder under 15 Pa.C.S.A. § 1571-1580 and entered judgment in the amount of $4,433,000[.00] against Scott Linde and each of the [Six] Key Employees[?]

5. Did the lower court commit an abuse of discretion and err as a matter of law when it awarded prejudgment interest in the amount of $959,000[.00] from December 31, 2012 at 4.5% per annum because prior to the lower court's order of December 28, 2017 there was no sum certain which was to be paid by Defendant, Scott, and the [Six] Key Employees to Barbara or the date upon which a sum certain was to be paid[?]

6. Did the lower court commit an abuse of discretion and err as a matter of law when it determined the fair value of

[LindeCo] at $17,731,000[.00] and thus the respective allocation of the fair value of Barbara's shares at $4,433,000[.00] because the lower court solely relied on Barbara's valuation expert's opinion of value which was faulty because he utilized non comparable guideline companies and his elimination of long standing recognized business methods historically utilized by [LindeCo] in order to establish a hypothetical fair value of [LindeCo?]

Appellants' Brief at 7-9 (some capitalization omitted).

First, Appellants claim that the trial court erred when it found that Scott breached his fiduciary duty to Barbara. This claim is composed of three sub-arguments. First, Appellants claim, Scott did not breach his fiduciary duty to Barbara because "all of Scott's actions were in furtherance of his fiduciary duty to the shareholders of [LindeCo]." *Id.* at 24. Second, Appellants claim that Scott is entitled to the benefit of the business judgment rule and is insulated from liability in this case because all of his actions were done in good faith and he "honestly and rationally believed [his] decisions were in the best interest of the corporation." *Id.* at 34. Finally, Appellants claim that the trial court's denial of Barbara's Motion to Appoint a Custodian "affirmatively establish[es]" that Scott acted reasonably towards Barbara.[8] *Id.* at 36-37. These claims fail.

_____

[8] Barbara devotes a significant portion of her brief to various arguments that Appellants waived all of their issues on appeal. *See* Barbara's Brief at 11-27. First, Barbara contends, Appellants waived their claims that the trial court erred in finding: that Scott breached his fiduciary duty to Barbara; that the Six Key Employees aided and abetted Scott's breach; and, that Scott and the Six Key Employees engaged in a civil conspiracy. Barbara argues that waiver is required because Appellants never moved for a compulsory non-suit at the

close of Barbara's case or a directed verdict at the close of evidence on any of these issues. Barbara's Brief at 12-13.

As we have held, "under our caselaw, to preserve the right to request a JNOV post-trial, a litigant must first request a binding charge to the jury or move for a directed verdict or a compulsory non-suit at trial." ***Youst v. Keck's Food Serv., Inc.***, 94 A.3d 1057, 1071 (Pa. Super. 2014) (quotations, citations, and corrections omitted); ***see also Felix v. O'Brien***, 199 A.2d 128, 129 (Pa. 1964). Nevertheless, in this case, the liability phase of the trial was conducted by submission of the record, as created during the six-day hearing on Barbara's Motion for Appointment of Custodian, to the trial court for decision. Thus, the trial court's liability determination was based upon an existing, closed record. Further, the certified record does not disclose the circumstances under which the record was submitted to the trial court and we do not see any place where the trial court gave Appellants a valid opportunity to move for a directed verdict or a compulsory non-suit upon submission of the record or during the liability phase of the trial. Thus, it appears as though the first time Appellants could have requested this type of relief was in their December 1, 2015 "motion for post trial relief," which they filed after the liability phase of the proceeding. ***See*** Appellants' Motion for Post Trial Relief, 12/1/15, at 1-5. Therefore, to the extent Appellants raised their first three claims in this December 1, 2015 motion, the claims are not waived for failure to move for a directed verdict or a compulsory non-suit at trial. ***See id.***

Next, Barbara claims that Appellants waived their first three appellate issues because they did not include the claims in the post-trial motion that they filed after the damages phase of the trial. Barbara's Brief at 17-19. This claim fails. As noted above, following the liability phase of the proceedings, Appellants filed their December 1, 2015 "motion for post trial relief." Although the December 1, 2015 motion was filed after the liability phase of the proceeding (and, thus, prior to the trial court's award of damages), Appellants' December 1, 2015 motion provided the trial court with the "opportunity to review and reconsider its earlier rulings and correct its [alleged] error[s]" during the liability phase. ***See Meeting House Lane, Ltd. v. Melso***, 628 A.2d 854, 856 (Pa. Super. 1993); ***see also Stevenson v. General Motors Corp.***, 521 A.2d 413, 419 (Pa. 1987) ("the two phases [of a bifurcated trial] are viewed as two halves of a single proceeding"). Thus, to the extent Appellants raised their first three claims in this December 1, 2015 motion, the motion fulfilled the purpose behind Rule 227.1 and waiver is not required simply because Appellants failed to repeat the claims in the post-trial motion they filed after the damages phase of the proceeding. ***See Meeting House***

*Lane*, 628 A.2d at 856 ("[Rule 227.1's] purpose is to provide the trial court with an opportunity to review and reconsider its earlier rulings and correct its own error"); *c.f. Stevenson*, 521 A.2d at 419 (holding that, in a bifurcated trial, the trial court is permitted to "examine all of the evidence in ruling on post-trial motions filed after the damage verdict ends the trial").

Third, Barbara argues that Appellants waived all of their issues on appeal, as Appellants' post-trial motion did not "disclose to the trial court the location in the record in which it is claimed the issue was previously presented and preserved." Barbara's Brief at 20. We conclude that, in this case, Appellants' failure to "state how the grounds were asserted in pre-trial proceedings or at trial" does not result in the wholesale waiver of Appellants' claims on appeal. *See* Pa.R.C.P. 227.1(b)(2); *see also Meeting House Lane*, 628 A.2d at 857 ("[w]e acknowledge that appellant's post-trial motion was not in full conformity with both the spirit and the letter of Rule 227.1's requirement that the post-trial motion state how the grounds for relief were asserted in a pre-trial proceeding or at trial. . . . However, the tenor of our law would not find appellant's failure to constitute waiver of his issues that were otherwise properly preserved").

Fourth, Barbara observes that, following the damages phase, the trial court denied Appellants' post-trial motion and, in its order, the trial court declared that it denied relief because Appellants' post-trial motion failed to "state how the grounds were asserted in pre-trial proceedings or at trial." *See* Barbara's Brief at 21-22; Trial Court Order, 4/3/18, at 1; *see also* Pa.R.C.P. 227.1(b). According to Barbara, Appellants waived all of their claims on appeal because, within their Rule 1925(b) statement, Appellants did not specifically challenge the trial court's "determination that all of the [issues raised in the] post-trial motions . . . were waived." Barbara's Brief at 21. Barbara's waiver claim fails because, in this case, Appellants' challenge to the trial court's waiver determination was subsumed within Appellants' more general challenges to the trial court's rulings and determinations. As such, this argument fails. *See* Pa.R.A.P. 1925(b)(v) ("[e]ach error identified in the [Rule 1925(b)] Statement will be deemed to include every subsidiary issue contained therein").

Fifth, Barbara argues that Appellants waived all issue on appeal because their Rule 1925(b) statement was prolix. Barbara's Brief at 22. This argument fails. Pa.R.A.P. 1925(b) ("the number of errors raised will not alone be grounds for finding waiver").

As we have explained:

> [a] JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our [standard] of review is [*de novo*]. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [fact finder] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

_____

Finally, Barbara claims that Appellants waived all of their issues because of certain, insignificant defects in their brief. *See* Barbara's Brief at 23-26. Insignificant defects in a brief will not result in waiver. *See* Pa.R.A.P. 2101 ("if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed"); *AmeriChoice Fed. Credit Union v. Ross*, 135 A.3d 1018, 1022 (Pa. Super. 2015) ("we need only quash an appeal based upon a defective appellate brief if such defects impair our ability to conduct appellate review") (quotations and citations omitted).

Although the various waiver claims discussed above are unavailing, we will, of course, only consider those claims that Appellants properly raised at the trial level and preserved on appeal. *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b)] Statement . . . are waived"); *Commonwealth v. Spotz*, 716 A.2d 580, 585 n.5 (Pa. 1999) ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief").

*Am. Future Sys., Inc. v. BBB*, 872 A.2d 1202, 1215 (Pa. Super. 2005) (quotations and citations omitted).

Appellants' first sub-argument on appeal contends that the trial court erred when it concluded that Scott breached his fiduciary duty to Barbara because "all of Scott's actions were in furtherance of his fiduciary duty to the shareholders of [LindeCo]." *Id.* at 24. This claim fails.

Scott is the majority and controlling shareholder of LindeCo and Barbara is the minority shareholder of the corporation. As our Supreme Court has explained:

> It has long been recognized that majority shareholders have a duty to protect the interests of the minority. This Court has stated that "majority stockholders occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." [*Hornsby v. Lohmeyer*, 72 A.2d 294, 298 (Pa. 1950)]. This does not mean, of course, that majority shareholders may never act in their own interest, but when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation.

*Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983) (emphasis and some citations omitted); *see also* 2 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 7:3 ("[w]hether imposed because of the controlling shareholders' direct influence acting in their capacity as shareholders or because of indirect influence through directors or officers whom they control, courts require controlling shareholders to exercise their powers in good faith and in a way that does not oppress the minority").

Further, LindeCo is a closely held corporation. **See** 15 Pa.C.S.A. § 1103

(defining a "closely held corporation" as: "[a] business corporation that: (1)

has not more than 30 shareholders; or (2) is a statutory close corporation").

A closely held corporation has certain, special characteristics that differentiate

it from a publicly held corporation:

> [In a closely held corporation,] there often is no separation of function between those who provide the capital and those who manage the enterprise. Closely held enterprises tend to entail more intimate and intense relationships among a smaller number of participants. Such an enterprise is not just a vehicle for investment of the participants' monetary capital but also serves as a vehicle for investment of their human capital by providing everyday employment. Shareholders in a close corporation usually expect both employment and a meaningful role in management. Further, they often have additional bonds, such as family or other personal relationships that are interwoven with business ties and influence what they hope and expect to derive from the enterprise.
>
> In a close corporation setting, the norm of free transferability of shares is illusory. Because of the size of the business and the small number of participants there is no ready market for interests in the enterprise. Indeed, because of the close personal relationship that characterizes the closely held business, the participants often affirmatively restrict who can join the enterprise to avoid being stuck in an intimate relationship with someone with whom they are not compatible.

2 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS

§ 7:2.

As the United States District Court for the Western District of

Pennsylvania explained, the unique characteristics of a closely held

corporation create unique opportunities for majority shareholders to oppress minority shareholders:

> The acute vulnerability of minority shareholders in the closely-held corporation is well recognized. It stems principally from two factors. Because of its controlling interest, the majority is able to dictate to the minority the manner in which the corporation shall be run. In addition, shares in closed corporations are not publicly traded and a fair market for these shares is seldom available. In contrast, a partner can act to dissolve a partnership [and] a shareholder in a large public-issue corporation can sell his stock on the market if he is dissatisfied with the way things are run. Dissension within the close corporation tends to make the minority interest even more unattractive to a prospective purchaser. As a consequence, a shareholder challenging the majority in a close corporation finds himself on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder.

**Orchard v. Covelli**, 590 F.Supp. 1548, 1557 (W.D.Pa. 1984).

Legal commentators have also observed that, in a close corporation, minority shareholders are particularly vulnerable to being "squeezed-out" by the majority. In O'NEAL AND THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS, the authors define the terms "squeeze-out" and "partial squeeze-out" in the following manner:

> By the term "squeeze-out" is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants. . . . [The term "partial squeeze-out" means an] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled. A squeeze-out

> normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose.
>
> . . .
>
> The term "freeze-out" is often used as a synonym for "squeeze-out."

1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 1:1.

As we have held: "an attempt by a group of majority shareholders to 'freeze out' minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders."[9] *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003); *Ford v. Ford*, 878 A.2d 894, 905 (Pa. Super. 2005) ("[f]reezing out the minority in order to benefit the majority is a breach of fiduciary duty"); *see also Orchard*, 590 F.Supp. at 1557 ("any attempt to 'squeeze out' a minority shareholder must be viewed as a breach of [] fiduciary duty"); *Ford*, 878 A.2d at 900 (holding: "[o]ppressive actions refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise"), *quoting Gee v. Blue Stone Heights Hunting Club, Inc.*, 604 A.2d 1141, 1145 (Pa. Cmwlth. 1992).

---

[9] Although we use the term "squeeze-out" in this opinion, we note that "[t]he term 'freeze-out' is often used as a synonym for 'squeeze-out.'" 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 1:1.

The evidence, viewed in the light most favorable to Barbara, thoroughly supports the trial court's determination that Scott intentionally and systematically squeezed-out Barbara from LindeCo – and that Scott, thus, breached his fiduciary duty to Barbara.[10]

We will not restate all of the facts quoted above. However, we note that, viewed in the light most favorable to Barbara, the evidence demonstrates that Scott expressly threatened to squeeze-out Barbara from LindeCo in an attempt to harm her, that Scott acted upon this threat, and that Scott accomplished his intended squeeze-out. Indeed, Barbara testified that, after Scott told her that "he wanted [her] out of his life and that he would destroy [her]," Scott convened a March 9, 2012 special shareholders' meeting. During this meeting, and over Barbara's objections, Scott changed the role of the secretary of the corporation; changed the quorum requirements for transacting business; amended the by-laws to eliminate cumulative voting; and, "empowered the single majority shareholder to remove the entire board without cause." N.T. Trial, 4/29/14, at 58-59 and 63-65. All of these actions

---

[10] To support their argument on appeal, Appellants erroneously view the evidence in the light most favorable to themselves. **See** Appellants' Brief at 21-44. As noted above, this runs contrary to our standard of review. **See Am. Future Sys.**, 872 A.2d at 1215 ("[w]hen reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference").

were detrimental to Barbara's interests and were in furtherance of Scott's expressed desire to get Barbara "out of his life" and to economically "destroy [her]."

Scott then removed Barbara from the board of directors and elected, as directors, himself and the Six Key Employees. *Id.* at 58-59. Five days later – during a meeting of the LindeCo board of directors – the new board unanimously removed Barbara as secretary. Minutes of Meeting of Board of Directors of LindeCo, 3/14/12, at 1.

Barbara testified that her removal from the board and from her office as secretary made it so that she was "no longer allowed to have access to any financial information, other than [year-end] financials." She testified that "[i]t was impossible for [her] to do [her] job without financial information." N.T. Trial, 4/29/14, at 59-60. Further, Barbara testified that, after her removal from the board: she was "denied access entirely" to the LindeCo computer system; "all of [her] belongings were removed from [her] office" and she was not permitted back into her office; and, "[n]o one [at LindeCo] would speak to [her], no one would reply to [her] emails." Finally, on October 31, 2012, LindeCo formally terminated Barbara's employment. *Id.* at 66.

Barbara testified that her termination brought her financial ruin, including: the loss of her annual, $120,000.00 salary; the loss of medical benefits for her and her children; and, the loss of additional benefits of approximately $100,000.00 per year. *Id.* at 67-70. Moreover, after Barbara's termination, Scott and the members of LindeCo's board participated in other

acts to "financially destroy[]" her. ***See id.*** at 89. These acts include the payment, by LindeCo, of approximately $1.4 million, to the Scott F. Linde Family S Corporation Trust for a debt that LindeCo originally owed to Linde Enterprises – a company that Barbara co-owned; and, the unaccounted-for purchase, by LindeCo, of the vast majority of Linde Enterprises' assets. These actions "effectively drained all cash from Linde Enterprises, to deny [Barbara] access to [the money] and enable [her] to financially go forward, to achieve the goal of financially destroying [her]." ***Id.*** at 89.

The above evidence is sufficient to prove that Scott explicitly threatened to eliminate Barbara from LindeCo – under an expressed desire to get her "out of his life" and economically "destroy" her – and that Scott then used his positions as a board member and the majority shareholder of LindeCo to do so. Therefore, the evidence is sufficient to support the trial court's decision that Scott squeezed-out Barbara from LindeCo and, thus, that Scott breached the fiduciary duties that he, the majority shareholder of LindeCo, owed to the minority shareholder, Barbara. ***See Viener***, 834 A.2d at 556 ("an attempt by a group of majority shareholders to 'freeze out' minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders").

Appellants also argue that the trial court erred when it concluded that Scott breached his fiduciary duty towards Barbara, as Scott's actions fell within the business judgment rule. ***See*** Appellants' Brief at 33-35.

As our Supreme Court has held:

> The business judgment rule insulates an officer or director of a corporation **from liability for a business decision made in good faith** if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.

***Cuker v. Mikalauskas***, 692 A.2d 1042, 1045 (Pa. 1997) (emphasis added).

Appellants' claim on appeal immediately fails, as the trial court expressly found that Scott intentionally squeezed-out Barbara from LindeCo – and that he acted in bad faith and with "animus against Barbara" when doing so. Trial Court Opinion, 11/13/15, at 19. As explained above, the evidence thoroughly supports the trial court's factual conclusions. Therefore, Appellants' second sub-claim necessarily fails. ***See also Viener***, 834 A.2d at 554 (rejecting the defendants' claim that the business judgment rule insulated them from liability for squeezing out the plaintiff from participating in the governance of a closely held corporation; holding: "[t]he crux of this case is [plaintiff's] contention that he was 'frozen out' of meaningful participation in the governance of the corporation that he co-founded. . . . Therefore, the 'business judgment rule' would not insulate [the defendants] from liability in this case, because the issue is the prevention of a shareholder-director's participation in the governance of a closely held corporation, as opposed to the power of the corporation to manage its property and conduct its business affairs. As such, judicial determination of this issue requires an analysis of the equitable

relationship between [the plaintiff and the defendants] and, therefore, does not implicate matters left to the business judgment of [the] corporate officers or directors").

In Appellants' third sub-argument, Appellants claim that the trial court's refusal to remove Scott from the board of directors and its denial of Barbara's Motion to Appoint a Custodian "affirmatively establish[es]" that Scott acted reasonably towards Barbara. Appellants' Brief at 36-37. This claim is meritless.

Removal of a director by the court is governed by 15 Pa.C.S.A. § 1726(c). This section declares:

> **(c) Removal by the court.**--Upon application of any shareholder or director, the court **may** remove from office any director in case of fraudulent or dishonest acts, or gross abuse of authority or discretion with reference to the corporation, or for any other proper cause, and may bar from office any director so removed for a period prescribed by the court. . . .

15 Pa.C.S.A. § 1726(c) (emphasis added).

Section 1767 of the Business Corporation Law ("BCL") authorizes a court to appoint a custodian of a corporation. In relevant part, Section 1767 provides:

> **(a) General rule.**-- . . . upon application of any shareholder, the court **may** appoint one or more persons to be custodians of and for any business corporation when it is made to appear that:
>
> . . .

(2) in the case of a closely held corporation, the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5% or more of the outstanding shares of any class of the corporation in their capacities as shareholders, directors, officers or employees. . . .

15 Pa.C.S.A. § 1767(a) (emphasis added).

In context, the plain statutory language of both Section 1726(c) and 1767(a) makes it evident that the trial court is authorized – **but not required** – to provide the sanctioned relief in the event the trial court makes the necessary findings. *See also A. Scott Enters., Inc. v. City of Allentown*, 142 A.3d 779, 787 (Pa. 2016) ("[a]lthough 'may' can mean the same as 'shall' where a statute directs the doing of a thing for the sake of justice, it ordinarily is employed in the permissive sense"); *Commonwealth v. A.M. Byers Co.*, 31 A.2d 530, 532 (Pa. 1943) ("[t]he word 'may' clearly implies discretionary power. The language is permissive, rather than mandatory"). On this basis alone, Appellants' third sub-claim fails: the trial court's refusal to remove Scott from the board of directors and its denial of Barbara's Motion to Appoint a Custodian simply do not "affirmatively establish[]" that Scott acted reasonably towards Barbara. *See* Appellants' Brief at 36. The rulings simply mean that the trial court exercised its discretion in refusing to grant the requested relief.

Appellants' first numbered claim on appeal thus fails.

Next, Appellants claim that the trial court erred when it found that the Six Key Employees aided and abetted Scott's breach of his fiduciary duties. According to Appellants, the trial court's decision was erroneous because the

court "totally ignored the application of the business judgment rule to their actions as directors" and the court's "conclusion is not supported by facts in the record." Appellants' Brief at 45 and 47 (some capitalization omitted).

Appellants have provided this Court with no argument as to how the trial court "totally ignored the application of the business judgment rule to [the Six Key Employees'] actions as directors." *See id.* at 45-48. Therefore, this sub-claim is waived. *Spotz*, 716 A.2d at 585 n.5 ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief"); *Rabatin v. Allied Glove Corp.*, 24 A.3d 388, 396 (Pa. Super. 2011) ("this Court may not act as counsel for an appellant and develop arguments on his behalf").

Appellants also claim that the trial court's decision that the Six Key Employees aided and abetted Scott's breach of his fiduciary duties to Barbara was "not supported by facts in the record." Appellants' Brief at 47. This claim fails.

Section 876 of the Restatement (Second) of Torts declares:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876; **Sovereign Bank v. Valentino**, 914 A.2d 415, 421-424 (Pa. Super. 2006) (applying Section 876 of the Second Restatement of Torts and concluding that the plaintiff "presented sufficient, circumstantial evidence to demonstrate concerted tortious conduct on the part of [the defendant]").

The trial court thoroughly explained why Appellants' claim fails:

> Essentially, given [Section 876 of the Second Restatement of Torts, the Six Key Employees] must have either committed separate torts themselves in connection with the [squeezing] out of Barbara [] or pursued with Scott [] the common goal of [squeezing] out Barbara. . . . Although [the trial] court is not convinced that any of the [Six Key Employees] committed a separate tort against Barbara [], the evidence showed that on March 14, 2012, the LindeCo board of directors, which consisted at that time of Scott [and the Six Key Employees], removed Barbara from her position as LindeCo secretary, effectively cutting off her access to financial information [(and, hence, preventing her ability to do her work as an employee)], and caused her over the coming months to be removed from her office and terminated as an employee. Thus, [the trial] court finds that the entire board of directors, from the time the board consisted of Scott and the [Six Key Employees] onward, engaged in a course of conduct that effectively [squeezed-out] Barbara [from] LindeCo. As such, [the trial court found] that the [Six Key Employees] did aid and abet Scott [] in his breach of the fiduciary duty he owed to the [minority] shareholder Barbara [], and thus the [Six Key Employees], in their capacity as members of the LindeCo board of directors, are liable for any damage caused to Barbara [] by the breach.

Trial Court Opinion, 11/13/14, at 23-24.

We agree with the trial court's cogent analysis and conclude that Appellants' second numbered claim on appeal fails.

Third, Appellants claim that the trial court erred in finding that they were liable for civil conspiracy because "Barbara failed to prove malice." Appellants' Brief at 51. Appellants did not raise this claim in their post-trial motions or in their Rule 1925(b) statement. **See** Appellants' Motion for Post-Trial Relief, 12/1/15, at 1-5; Appellants' Motion for Post-Trial Relief, 1/8/18, at 1-11; Appellants' Rule 1925(b) Statement, 6/6/18, at 1-14. Therefore, the claim is waived. **See L.B. Foster Co. v. Lane Enterprises, Inc.**, 710 A.2d 55 (Pa. 1998) ("Pa.R.C.P. 227.1 requires parties to file post-trial motions in order to preserve issues for appeal. If an issue has not been raised in a post-trial motion, it is waived for appeal purposes"); Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) Statement . . . are waived").[11]

Appellants' fourth numbered claim on appeal asserts that the trial court "erred in ordering [Appellants] to purchase Barbara's shares in [LindeCo]

_____

[11] Appellants also claim, in conclusory fashion, that "the acts of Scott and the [Six] Key Employees as directors of [LindeCo] cannot be a civil conspiracy" because they were acting as agents of LindeCo and LindeCo cannot conspire with itself. **See** Appellants' Brief at 52-53. Appellants did not raise this claim in their post-trial motions or in their Rule 1925(b) statement. **See** Appellants' Motion for Post-Trial Relief, 12/1/15, at 1-5; Appellants' Motion for Post-Trial Relief, 1/8/18, at 1-11; Appellants' Rule 1925(b) Statement, 6/6/18, at 1-14. Therefore, the claim is waived. Moreover, Appellants failed to develop this claim in their brief. **See** Appellants' Brief at 52-53. As such, waiver is required for this independent reason. **Spotz**, 716 A.2d at 585 n.5.

because Barbara never asked for such relief nor was such relief pled in Barbara's complaint." Appellants' Brief at 54 (some capitalization omitted). This claim fails.

Initially, we observe that Appellants do not claim that the trial court could have only granted Barbara a buy-out if she complied with the procedures set forth in the BCL's subchapter on dissenters' rights. *See id.* at 54-61; *see also* 15 Pa.C.S.A. §§ 1105 and 1571-1580.[12] Further, Appellants do not claim

_____

[12] Section 1105 of the BCL, entitled "restriction on equitable relief," declares:

> A shareholder of a business corporation shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan or amendment of articles authorized under any provision of this title, nor any right to claim the right to valuation and payment of the fair value of his shares because of the plan or amendment, except that he may dissent and claim such payment if and to the extent provided in Subchapter D of Chapter 15 (relating to dissenters rights) where this title expressly provides that dissenting shareholders shall have the rights and remedies provided in that subchapter. Absent fraud or fundamental unfairness, the rights and remedies so provided shall be exclusive. Structuring a plan or transaction for the purpose or with the effect of eliminating or avoiding the application of dissenters rights is not fraud or fundamental unfairness within the meaning of this section.

15 Pa.C.S.A. § 1105 (footnote omitted); *see also Orchard*, 590 F.Supp. at 1560 (as the remedy for the minority shareholder's successful breach of fiduciary duty claim for being squeezed-out of a closely held corporation, the trial court ordered that the majority shareholder buy-out the minority shareholder's interest in the corporation; the court held that the statutory predecessor to Section 1105 did not preclude its chosen remedy and noted: "[b]ecause the legislature has determined that the exclusive remedy for certain corporate acts shall be specifically defined by statute, it does not follow

that the trial court lacked the general equitable authority to order their involuntary purchase of Barbara's shares as a remedy for their oppressive conduct and breach of fiduciary duty towards Barbara; nor do Appellants claim that the trial court's chosen remedy is too harsh. ***See id.*** at 54-61. Instead, within the argument section of Appellants' brief, Appellants claim only that the trial court abused its discretion in ordering this particular remedy because Barbara did not request this specific form of relief in her complaint. ***Id.*** Therefore, we shall confine our discussion of Appellants' fourth numbered claim to the only issue Appellants preserved on appeal: whether the trial court "erred in ordering [Appellants] to purchase Barbara's shares in [LindeCo] because Barbara never asked for such relief nor was such relief pled in Barbara's complaint."[13, 14] ***Id.*** at 54 (some capitalization omitted); ***see also***

that the remedy is unavailable to redress other problems arising in the corporate setting").

[13] Within Appellants' statement of questions involved, Appellants allude to trial court error in reopening the record after Barbara "had rested and the record was closed." ***See*** Appellants' Brief at 8. The argument section of Appellants' brief contains no argument on this issue. ***See id.*** at 54-61. Therefore, any such claim is waived. ***See Spotz***, 716 A.2d at 585 n.5.

[14] In conjunction with their claim, Appellants also state, in passing, that the trial court erred in granting the relief because Barbara did not include a "cause of action in the complaint to be bought out of [LindeCo]." Appellants' Brief at 54 and 60 (some capitalization omitted). As explained in this opinion, the court-ordered buy-out of Barbara's shares was crafted as a remedy for the claims pleaded in Barbara's complaint – not as a separate cause of action. Further, Appellants do not contest the trial court's general equitable authority to order a buy-out as a remedy for Barbara's claims and Appellants do not claim that Barbara could only have been granted a buy-out if she complied

*Spotz*, 716 A.2d at 585 n.5 ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief").

Pennsylvania courts have variously characterized a breach of fiduciary duty claim as sounding in tort and in equity. *Ford*, 878 A.2d at 899 ("[a] claim of oppressive conduct, like a claim of breach of fiduciary duty, sounds in equity") (quotations and citations omitted); *Viener*, 834 A.2d at 554 ("[a] claim of breach of fiduciary duty sounds in equity"); *Wolf v. Fried*, 373 A.2d 734 (Pa. 1977) (derivative suit charging corporate directors with breach of fiduciary duty was an equitable action); *but see B.G. Balmer & Co. v. Frank Crystal & Co.*, 148 A.3d 454, 470 (Pa. Super. 2016) (characterizing a breach of fiduciary duty claim as a tort claim); *Drain v. Covenant Life Ins. Co.*, 712 A.2d 273, 278 (Pa. 1998) (characterizing a breach of corporate fiduciary duty claim as a tort claim); *Laurel Road Homeowners Ass'n, Inc. v. Freas*, 191 A.3d 938, 949 (Pa. Cmwlth. 2018) ("a claim for breach of fiduciary duty sounds in tort"); *see also* DAN B. DOBBS ET AL., THE LAW OF TORTS § 699 (2d ed. 2019) ("[a] breach of fiduciary duty . . . is a tort" that may permit both legal and equitable remedies); Restatement (Second) of Torts § 874 cmt. b. ("[a]

_____

with the procedures set forth in the BCL's subchapter on dissenters' rights. *See* Appellants' Brief at 54-61; *see also* 15 Pa.C.S.A. §§ 1571-1580. Thus, in discussing Appellants' claim, we will only consider whether the trial court "erred in ordering [Appellants] to purchase Barbara's shares in [LindeCo] because Barbara never asked for such relief nor was such relief pled in Barbara's complaint." Appellants' Brief at 54.

fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act. The local rules of procedure, the type of relation between the parties and the intricacy of the transaction involved, determine whether the beneficiary is entitled to redress at law or in equity"); *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014) (characterizing a breach of fiduciary duty claim as an "equitable tort").

Regardless of whether the claim is characterized as sounding in tort or in equity, our courts have consistently held that, in appropriate cases, equitable relief is available to redress the breach of a fiduciary duty. *See Wiseman v. Martorano*, 175 A.2d 873, 874-875 (Pa. 1961) (providing the plaintiff with equitable relief for his breach of fiduciary duty claim); *Viener*, 834 A.2d at 557-558 (the defendant breached his fiduciary duty to, and squeezed-out the plaintiff in, a closely held corporation; we affirmed the trial court's chosen, equitable remedy, which ordered the defendant's forced buy-out of the plaintiff's shares at fair value); *Kessler v. Broder*, 851 A.2d 944 (Pa. Super. 2004) (affirming the trial court's issuance of a mandatory preliminary injunction in favor of plaintiff and against defendants, based upon a breach of fiduciary duty claim, after the controlling-shareholder-defendants squeezed-out the minority-shareholder-plaintiff from the corporation); *Spiegel v. Greenberg*, 38 Pa. D. & C.2d 185 (C.C.P. Allegheny Cnty. 1965) ("[t]his breach of fiduciary duty, as well as the shocking unfairness of the agreement, gives rise to a right in equity for the plaintiff to set aside the agreement and recover the money paid").

To be sure, we have expressly held that equitable relief is available to remedy the breach of fiduciary duty in cases such as this where a majority shareholder in a closely held corporation squeezes-out a minority shareholder. *See Viener*, 834 A.2d at 557-558; *Kessler*, 851 A.2d at 948-950. Thus, in accordance with our precedent, equitable remedies were available to the trial court in this case.

As our Supreme Court has held, in equity:

> Under the prayer for general relief, a decree which accords with the equities of the cause may be shaped and rendered; the court may grant any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which has been asked for by the special prayer. Under the prayer for general relief, the plaintiffs are entitled to such relief as is agreeable to the case made in the bill, though different from the specific relief prayed for.

*Lower Frederick Twp. v. Clemmer*, 543 A.2d 502, 512 (Pa. 1988) (quotations, citations, and corrections omitted). Further, the *Clemmer* Court held: "[a] prayer for general relief is as broad as the equitable powers of the court. Under such a prayer a chancellor in equity may grant any relief that is consistent with the theory and purpose of the action." *Id.* (citations omitted); *see also Karpieniak v. Lowe*, 747 A.2d 928, 931 (Pa. Super. 2000) ("[a]n equity court may, of course, grant broader relief than that specifically requested when there is a prayer for general relief. However, that relief must be consistent with and agreeable to the case pleaded and proven") (citations omitted).

In the case at bar, the relief the trial court ordered was "consistent with and agreeable to the case pleaded and proven." ***See Karpieniak***, 747 A.2d at 931. We explain.

Within Barbara's complaint, Barbara claimed that Scott, as the controlling shareholder, breached the fiduciary duties he owed to her as the minority shareholder of LindeCo. Barbara also alleged that the Six Key Employees aided and abetted Scott's breach of his fiduciary duties to her and that Scott and the Six Key Employees engaged in a civil conspiracy to harm her. Moreover, Barbara claimed that, due to Scott's oppression, the trial court should remove Scott "from office as an officer and director of" LindeCo. With respect to each claim, Barbara included a general prayer for relief, requesting that the trial court "[g]rant such other and further additional relief as the [c]ourt may deem to be appropriate and just under the circumstances."

Further, the liability phase of the trial in this case consisted of record evidence, which supports the trial court's conclusions that: Scott, as the controlling shareholder of LindeCo, oppressed and breached his fiduciary duties towards LindeCo's minority shareholder, Barbara; the Six Key Employees aided and abetted Scott's breach of his fiduciary duties towards Barbara; "the disagreements between Barbara and Scott are pervasive, infecting the business of LindeCo and causing a great amount of distress to all parties involved;" and, although Scott acted oppressively towards Barbara, LindeCo, as a company, is otherwise healthy and well-managed and any removal of Scott as a director "would be devastating to the company and

would harm the interests of all stockholders, including [Barbara]." Trial Court Opinion, 11/13/15, at 18-25; Trial Court Opinion, 9/20/18, at 17 n.17.

From the record evidence, the trial court was faced with a potentially inequitable impasse. On the one hand, the trial court determined that Scott was essential to LindeCo's health and that his removal as a director of LindeCo would be "devastating to the company and would harm the interests of all stockholders." Trial Court Opinion, 11/13/15, at 18-25. On the other hand, the trial court determined that Scott abused his position as director and controlling shareholder of LindeCo by oppressing LindeCo's minority shareholder, Barbara, and that "the disagreements between Barbara and Scott are pervasive, infecting the business of LindeCo and causing a great amount of distress to all parties involved." *Id.*; Trial Court Opinion, 9/20/18, at 17 n.17.

Rather than choosing the extraordinary and inequitable remedy of removing Scott as a director (and thereby harming the company) or choosing the equally inequitable remedy of allowing the untenable *status quo* to persist, the trial court fashioned an equitable remedy: it refused to remove Scott as a director, but ordered that Appellants buy-out Barbara's shares in the company. *See* 2 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 358 ("Judicial removal of a director is an extraordinary remedy"). This equitable remedy was "consistent with and agreeable to the case pleaded and proven"

and, thus, proper in light of Barbara's general prayers for relief.[15, 16] *See*

*Karpieniak*, 747 A.2d at 931.  Appellants' claim to the contrary fails.

Fifth, Appellants claim that the trial court erred when it awarded Barbara

interest in the amount of $959,000.00 from December 31, 2012.  According

to Appellants, the award of interest was erroneous because "prior to the [trial]

court's order of December 28, 2017[,] there was no sum certain which was to

be paid by Scott and the [Six] Key Employees to [Barbara and there was no]

date upon which a sum certain was to be paid."  Appellants' Brief at 62 (some

capitalization omitted).  This claim fails.

"Our review of an award of pre-judgment interest is for abuse of

discretion."  *Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 755 (Pa. Super.

1999).  Our Supreme Court has emphasized:

> When a court comes to a conclusion through the exercise of
> its discretion, there is a heavy burden to show that this
> discretion has been abused.  It is not sufficient to persuade

---

[15] Barbara did not file a cross-appeal and she does not complain about the trial court's chosen remedy.

[16] We also observe that, during the liability phase of the trial, Barbara's counsel argued to the trial court:

> I think if the court finds that there has been a breach of
> fiduciary duty on the part of Scott . . . and the officers and
> directors of the corporation, there are a number of remedies
> that are available to the court, not the least of which is
> appointing an individual to value the interest of the
> corporation and to direct a buyout of certain value.

N.T. Trial, 4/29/14, at 16 (some capitalization omitted).

the appellate court that it might have reached a different conclusion, it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Absent an abuse of that discretion, we will not disturb the ruling of the trial court.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1140 (Pa. 2007) (citations omitted).

With respect to the award of pre-judgment interest, we have explained:

Our courts have generally regarded the award of [pre-judgment] interest as not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court. . . . While the general rule is that a successful litigant is entitled to interest beginning only on the date of the verdict, it is nonetheless clear that pre-judgment interest may be awarded when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment. Pre-judgment interest in such cases is a part of the restitution necessary to avoid injustice.

*Kaiser*, 741 A.2d at 755 (quotations and citations omitted). "The fairest way for a court is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing." *Gurenlian v. Gurenlian*, 595 A.2d 145, 148 (Pa. Super. 1991), *quoting Murray Hill Estates, Inc. v. Bastin*, 276 A.2d 542, 545 (Pa. 1971); *Smith v. Mitchell*, 616 A.2d 17, 21 (Pa. Super. 1992) ("in equity cases, the award and rate of interest allowed is at the discretion of the chancellor"), *quoting Daset Mining Corp. v. Indus. Fuels Corp.*, 473 A.2d 584, 595 (Pa. Super. 1984).

Here, the trial court concluded that Appellants' squeeze-out of Barbara began in March 2012. At that point, Barbara's minority interest in the closely-held corporation of LindeCo was nigh worthless in terms of market value, as Appellants had removed her from the board of directors and as secretary of the corporation and, for all intents and purposes, had eliminated her as an employee of LindeCo. To cure this injustice, the trial court fashioned the equitable remedy of ordering that Appellants buy-out Barbara's shares in LindeCo at the shares' December 31, 2012 fair value. The trial court then ruled that Barbara was entitled to interest on this amount, beginning on December 31, 2012.

Simply stated, given that Appellants squeezed-out Barbara from LindeCo in March 2012, Appellants' claim that the trial court abused its discretion when it awarded her interest on the fair value of her shares from December 31, 2012 must fail. Barbara was entitled to be fully compensated for her losses. To do so, the trial court held that Barbara was entitled to interest on the value of her shares that Appellants had essentially taken from her – and that this interest began to run at the time of the taking. The trial court's decision was in accord with the equities of this case, served to fully compensate Barbara for her losses, and was not an abuse of discretion. Appellants' claim to the contrary thus fails.

Finally, Appellants claim that the trial court abused its discretion when it accepted the conclusions of Barbara's valuation expert, Gregory Cowhey (hereinafter "Mr. Cowhey"), in determining the fair value of LindeCo.

Appellants' Brief at 69.  According to Appellants, Mr. Cowhey's analysis was "flawed in many ways," including:  Mr. Cowhey's "methodology created an inflated hypothetical value for [LindeCo] by eliminating the . . . leasing and maintenance transactions which were utilized by Barbara and Scott since [LindeCo's] inception in 2006" and Mr. Cowhey used incomparable guideline companies to arrive at his conclusions.  *Id.* at 69-77.  Appellants' claim is meritless.

Where the trial court sits as the finder of fact, it "has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented."  *In re Bosley*, 26 A.3d 1104, 1111 (Pa. Super. 2011).  "Resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence."  *Diehl v. Beaver*, 663 A.2d 232, 234 (Pa. Super. 1995).

The trial court carefully explained the reasons why it found Mr. Cowhey's expert opinion credible:

> Determination of the fair value of [Barbara's] shares in [LindeCo] depends heavily upon the evidence presented by the parties' two opposing expert witnesses, [Mr. Cowhey, for Barbara,] and John Stoner [(hereinafter "Mr. Stoner")] for [Appellants]. . . .  As such, a critical element of th[e trial] court's determination in the present matter [is] the credibility of the expert witnesses. . . .  Other elements the court must consider are the definition of fair value and subsequent valuation date, the valuation methodologies, and application of the proper methodology to the facts in this matter.

Fair value in the present case constitutes the value of [Barbara's] shares as of December 31, 2012. . . .

Three different methodologies can be used to determine the fair value of [Barbara's] shares in [LindeCo]. The three methodologies, or approaches, are as follows: the asset approach, the income approach, and the market approach. Valuation protocol requires consideration of all valuation techniques. The parties clearly dispute which valuation approach more properly reflects the value of [LindeCo]. Mr. Cowhey relies upon the similarities between the income and market approaches to determine valuation. Mr. Stoner relies upon an asset approach to determine valuation of [Barbara's] shares. Determining the correct valuation approach between the two different approaches Mr. Cowhey and Mr. Stoner provide becomes a dispositive issue of credibility.

It is clear to [the trial] court that Mr. Cowhey presents a superior credibility to Mr. Stoner. It should be noted that nothing about this opinion impugns Mr. Stoner's personally credible nature or skill in his profession. Rather, Mr. Stoner's decisively lacking credibility in this matter stems from an incomplete picture of the matter that [Appellants] provided to both Mr. Stoner and [Appellants'] counsel. The issue stems largely from Mr. Stoner's reliance on the Hunyady Appraisal for valuation of property and some fixed assets.

[LindeCo] provided the Hunyady Appraisal to Mr. Stoner, but did not include the accompanying narrative. Mr. Stoner's lack of awareness regarding the Hunyady Appraisal narrative is dispositive for two reasons. First, the narrative states that the Hunyady Appraisal is not [to] be used by anyone else without the written consent of the appraiser. Second, the narrative states that the Hunyady Appraisal is expressly limited to providing a basis for internal company review. It is absolutely clear to [the trial] court, based upon the narrative, that Mr. Stoner was not to use the Hunyady Appraisal at all, obviously including as a source for valuation of [LindeCo]. In fact, the narrative expressly states that any other use of the Hunyady Appraisal could result [in] misleading and inaccurate conclusions. [The trial] court finds it impossible to justify basing a valuation determination of [LindeCo] on an appraisal when the appraisal itself cautions

that such use could lead to misleading and inaccurate conclusions.

Notwithstanding the narrative issues as described above, it is still clear to [the trial] court that Mr. Stoner's reliance on the Hunyady Appraisal is insufficient for a valuation of [LindeCo]. Mr. Stoner admits that he does not perform valuations of machinery and equipment, and yet did perform such evaluations in an attempt to fill in the gaps not covered within the Hunyady Appraisal. That admittedly unreliable set of valuations is particularly dangerous considering Mr. Stoner based his valuation of [LindeCo] on the asset approach. [The trial] court cannot rely on a valuation derived from an asset approach that neither the underlying source supports, nor the admittedly unreliable valuations of the expert witness supports when the source is silent.

An asset approach is simply an improper method of valuation in the present case. The object of an appraisal proceeding is to determine the fair value of dissenter's shares on a going concern basis. The Hunyady Appraisal does not consider the benefits that could be generated by [LindeCo's] assets. In fact, the Hunyady Appraisal describes itself as a market value machinery and equipment appraisal and not a valued and continued use study. An asset approach is instead primarily used for holding companies, startup or troubled companies, or small businesses not easy to get into or out of, none of which apply to [LindeCo]. Therefore, a reflection of the assets does not accurately show the fair value of [LindeCo]. The asset approach method utilized by Mr. Stoner cannot properly inform [the trial] court regarding [LindeCo's] valuation.

Contrarily, Mr. Cowhey's expert analysis offers [the trial] court a credible basis for valuing [LindeCo]. [Appellants] unsuccessfully attempt to attack Mr. Cowhey's credibility. [Appellants] argue that Mr. Cowhey's [analytical] data comes from February 2017, more than four years following [the trial] court's finding that [Appellants squeezed-out Barbara] from [LindeCo. Appellants'] criticism is logically unsound. [The trial] court recognizes that Mr. Cowhey merely downloaded the data in February 2017, but importantly, he downloaded data that related back to the time of the

- 53 -

[squeezing] out, extending into the first quarter of 2013 to account for the unemployment rate carryover.

Although [Barbara] admits that Mr. Cowhey relies upon the same Hunyady Appraisal as Mr. Stoner, [Barbara] is also aware of the accompanying narrative. In fact, [Barbara] repeatedly requested the cover letter and was told no narrative accompanied it. [Barbara's] position is certainly plausible considering [LindeCo] told its own attorney that it did not possess the cover letter, and presumably then, any accompanying narrative. [Appellants] never question why or how [Barbara] came into possession of a copy of the Hunyady Appraisal narrative, but the question is a moot point anyway. Mr. Cowhey derives his valuation of [LindeCo] on the market and income approaches that are far less dependent on an appraisal of assets than is the asset approach Mr. Stoner utilized.

Nor does Mr. Cowhey's market analysis approach rely on improper comparable companies. IRS Revenue Ruling 59-60 Section 4.02(h) states that "[i]n selecting corporations for comparative purposes, care should be taken to use only comparable companies." [Appellants] repeatedly, and unsuccessfully, attempt to impugn Mr. Cowhey's comparative companies in his market approach based on both location and size of company. The very term "comparable company" is a misnomer better termed a "guideline company." A guideline company is one affected by the same types of macro and micro economic influences as the subject company and operates in a similar line of business. Conversely, neither geographic location nor size affect what constitutes a guideline company. As Mr. Cowhey's market approach analysis relies upon companies engaging, at least in part, in operations similar to [LindeCo], it appropriately complies with IRS Revenue Ruling 59-60.

When determining the valuation of [LindeCo, the trial] court must consider the role and economic influence of the leasing companies, a point disputed between the parties. The leasing companies' only operations were to purchase equipment and lease it back to [LindeCo]. In return, [LindeCo] was the sole customer of the leasing companies. The resultant exclusive relationship between [LindeCo] and the leasing companies eventually led to an imbalance in favor of the leasing

- 54 -

companies. [LindeCo] paid in excess of $30,000,000[.00] to the leasing companies between 2006 and 2015, including an estimated $21,000,000[.00] between 2006 and 2012, the year [of Barbara's squeeze-out].

Yet, at the same time the value of equipment [LindeCo] leased from the leasing companies was only valued at approximately $16,000,000[.00]. The imbalanced relationship led to [LindeCo] disgorging itself of an estimated $5,000,000[.00] prior to [Barbara's squeeze-out], and at least a further $9,000,000[.00] following [Barbara's squeeze-out]. As such, the transactions between [LindeCo] and the leasing companies were noneconomic transactions. Fair value calculations eliminate noneconomic transactions. Therefore, the transactions between [LindeCo] and the leasing companies must be removed from calculations of [LindeCo's] fair value. Once those transactions are reversed, [LindeCo's] profits tend to be comparable to or superior to the industry averages.

What remains is application of Mr. Cowhey's methodological approach to the fair value of [Barbara's] shares in [LindeCo] as of December 31, 2012. The income approach and market approach of [Barbara's] fair value results in an equity determination of [LindeCo] in the amount of $18,308,000[.00]. Application of other assets not listed in the income statement drops the fair value of [LindeCo] to $17,731,000[.00] as of December 31, 2012.

Trial Court Opinion, 12/28/17, at 13-19 (some quotations, citations, corrections, and capitalization omitted).

The trial court's analysis demonstrates that it carefully and methodically considered the evidence before it and that it concluded Mr. Cowhey's expert opinion was credible and Mr. Stoner's opinion was not. This determination was well-within the trial court's discretion as fact-finder. Appellants' attempt to impugn the trial court's credibility determination must, therefore, fail.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2019